**In re VICTORY MARKETS, INC., Debtor.**

**In re DUNCO REALTY & EQUIPMENT CORP., Debtor.**

**In re VM CUSTOM FIXTURES, INC., Debtor.**

**In re FOOD KING, INC., Debtor.**

**In re NORWICH RECYCLING CORP., Debtor.**

**In re GEDDES ST. PLAZA ASSOC., INC., Debtor.**

**Bankruptcy Nos. 95–63366 to 95–63371.**

United States Bankruptcy Court, N.D. New York.

April 26, 1996.

Menter, Rudin & Trivelpiece, P.C. (Jeffrey Dove, of counsel), Syracuse, New York, for Debtor.

Getnick, Livingston, Atkinson, Gigliotti & Priore, LLP. (Nicholas Priore, of counsel), Utica, New York, for Eton Centers Co.

Harter, Secrest & Emery (Debra Sudock, of counsel), Syracuse, New York, for Creditors Committee.

MEMORANDUM–DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

STEPHEN D. GERLING, Chief Judge.

Presently before the Court is a cross-motion of Eton Centers Co. ("Eton") filed Feb-

ruary 20, 1996, in response to a motion filed on January 19, 1996, by Victory Market Inc. ("Debtor") seeking a further extension of time to assume or reject a non-residential real property lease through March 20, 1996.[1] Eton requests that Debtor's motion be denied and seeks to have its lease with the Debtor rejected based on the argument that Debtor has failed to comply with § 365(d)(3) of the Bankruptcy Code (11 U.S.C. §§ 101–1330) ("Code").

Debtor's motion, as well as Eton's cross-motion, were heard by the Court at its regular motion term on February 27, 1996, in Utica, New York. Both parties agreed that the Debtor was obligated to pay any postpetition obligations pursuant to the terms of the lease if the Court was to grant the Debtor's request for an extension of the lease. The question of the extent of the obligations, in particular Eton's demand that the Debtor pay its pro rata share of real property taxes paid by Eton, was submitted to the Court for decision.

### JURISDICTIONAL STATEMENT

The Court has core jurisdiction over the parties and subject matter of this contested matter pursuant to 28 U.S.C. §§ 1334(b), 157(a), (b)(1), (b)(2)(A) and (O).

### FACTS

Debtor, along with five of its wholly-owned subsidiaries, filed voluntary petitions pursuant to Chapter 11 of the Code on September 20, 1995. At the time of filing, Debtor operated approximately fifty grocery stores throughout the northern and central New York State regions under the trade name "Great American Food Stores." Since filing its petition, Debtor has continued to operate and manage its business as a debtor-in-possession pursuant to §§ 1107 and 1108 of the Code.

Eton is the owner of a shopping center complex on Genesee Street in Utica, New York. Eton leases a portion of the nonresidential real property at the shopping center

to Debtor pursuant to the terms of a lease agreement dated June 24, 1955, which was subsequently modified on July 31, 1961, and again on March 27, 1981 ("Lease"). Said Lease was assigned and assumed by Victory on or about April 5, 1993, and was to expire by its terms on March 31, 1996, although Debtor had the option to renew it. Pursuant to the modification of the Lease on March 27, 1981,

> The Tenant [Debtor] shall . . . reimburse the Landlord [Eton] for its pro rata share of the Landlord's annual real estate taxes on the shopping center. . . . The Tenant's obligation pursuant to this paragraph shall become due and payable within 30 days after the payment by the Landlord of such property taxes, upon submission to the Tenant by the Landlord of a statement showing the computations upon which the Tenant's payment under this paragraph is based . . .

See ¶ 4 of Lease Modification Agreement, Exhibit "A" of Eton's Cross–Motion, dated February 20, 1996.

On or about August 23, 1995, Debtor was sent a statement ("Statement") by Eton indicating that Debtor's share (51.3%) of the real estate taxes for 1994–95 paid by Eton totalled $69,456.46 (see Exhibit "C" of Eton's Cross–Motion).

### ARGUMENTS

Eton contends that Debtor should not be allowed to extend the Lease unless it pays Eton the full amount of its 51.3% share of the taxes paid by Eton as billed, namely $69,-456.46. Eton argues that it is a postpetition obligation of the Debtor for which Code § 365(d)(3) requires timely payment. Debtor argues that as the Statement was sent to the Debtor on or about August 23, 1995, the obligation arose prepetition. In other words, it is Debtor's position that it is the date that the Statement was submitted to the Debtor and not the date the obligation comes due for

---

1. On November 6, 1995, Debtor filed a similar motion seeking an extension through January 20, 1996, which the Court granted at a hearing in Syracuse, New York, on November 21, 1995. An

Order was signed on December 5, 1995, to that effect and required that the Debtor comply with Code § 365(d)(3).

payment by the Debtor that should establish the nature of the obligation.

In addition, the Debtor, relying on *In re Child World, Inc.*, 161 B.R. 571 (S.D.N.Y. 1993), argues that even if the Court determines that the obligation arose postpetition, Debtor should only be responsible for its pro rata share of the 1994–95 real estate taxes for the postpetition period from September 20, 1995 to December 1995. Debtor contends that the balance of its share of the 1994–95 taxes should be considered a prepetition debt not subject to the requirements of Code § 365(d)(3).

## DISCUSSION

■ It appears from a review of the case law that the District Court for the Northern District of New York has not as yet had occasion to address this issue. In support of its arguments, Debtor has referred this Court to the decision of U.S. District Judge Gerald Goettel, sitting in the Southern District of New York, issued on November 29, 1993, in *Child World.* Interestingly enough, U.S. District Judge Sonia Sotomayor, sitting in the Southern District of New York as well, rendered a decision three months later also interpreting Code § 365(d)(3). *See In re R.H. Macy & Co., Inc.*, 1994 WL 482948 (S.D.N.Y.1994). While not bound by either decision since they were not rendered in this district, the Court normally would give a significant amount of weight and deference to decisions rendered by a district court as a matter of course in resolving the matter *sub judice.* Unfortunately, the district judges in the cases cited above took divergent positions in their interpretation of Code § 365(d)(3), and the Second Circuit Court of Appeals did not have occasion to resolve either case.

Rather than rely on either case, this Court begins its analysis with an examination of the language of Code § 365(d)(3), which provides that the "trustee shall timely perform all the obligations of the debtor ... arising from and after the order for relief under any unexpired lease of nonresidential real property ..." Code § 365(d)(3) was added to the Code in 1984 to "insure that debtor-tenants pay their rent, common area, and other charges on time pending the trustee's assumption or rejection of the lease." 130 Cong.Rec. S8894–95 (daily ed. June 29, 1984) (remarks of Senator Hatch). Specifically, the trustee is required "to perform all the obligations of the debtor under a lease of nonresidential real property at the time required in the lease." *Id.* The District Court in *Child World* concluded that Code § 365(d)(3) is "ambiguous as to when a debtor-or-tenant's obligation under a lease to reimburse the landlord for real estate taxes arises." *Child World, supra,* 161 B.R. at 574. It then examined the legislative history and found "compelling evidence that Congress did not intend Code § 365(d)(3) to include debtor-tenants' rental obligations arising prepetition, but billed postpetition." *Id.* The court reasoned that although Code § 365(d)(3) abolished the need for review by the court of the "reasonableness" of the terms of the lease, there was still a requirement that there be a prorating of the debtor-tenant's rent to cover only the postpetition, prerejection period, regardless of billing date. *Id.* at 575–576. The court found support for its conclusion in the policy of narrowly construing statutory priorities in order to treat creditors as equally as possible. *Id.* at 574 (citing *Trustees of Amalgamated Insurance Fund v. McFarlin's, Inc.*, 789 F.2d 98, 101 (2d Cir.1986)), 576. The court took the position that payment of real property taxes which arose prepetition, even though billed postpetition, as is the case herein, did not constitute compensation for the "current services" the landlord is "forced to provide" postpetition as alluded to by Senator Hatch (*see id.* at 577) and, therefore, should be prorated to reflect only the services provided during the postpetition period. In so holding, the court reversed the decision of U.S. Bankruptcy Judge Howard Schwartzberg, who had found that the entire amount of taxes for the second half of the fiscal year was an "integral component of the rent under the lease" and was not to be prorated but rather was to be paid in full pursuant to the "plain meaning" of the Code even though it covered a postrejection period. *See In re Child World, Inc.*, 150 B.R. 328, 333 (Bankr. S.D.N.Y.1993). Judge Schwartzberg noted that there was nothing in the lease which

called for prorating of the taxes based on occupancy of the debtor. *Id.* at 332.

In *In re R.H. Macy & Co., Inc.,* 152 B.R. 869 (Bankr.S.D.N.Y.1993), *aff'd* 1994 WL 482948 (S.D.N.Y.1994), the debtor was issued an adjusted statement for reassessed real property taxes by its landlord postpetition. Chief U.S. Bankruptcy Judge Burton Lifland found that the ordinary meaning of the word "obligation" referred to 'that which a person is bound to do or forbear.' *Id.* at 873, quoting *Black's Law Dictionary* 1074 (6th ed. 1990). The court concluded that consonant with the plain language of Code § 365(d)(3), the payment of the reassessed taxes had to be timely performed as a contractual obligation of the debtor which arose postpetition upon debtor's receipt of the adjusted statement from its landlord. The court declined to give credence to the debtor's policy arguments regarding Code § 365(d)(3), noting that the court 'must presume that a legislature says in a statute what it means and means in a statute what it says there.' *Id.* at 874, quoting *Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 252–54, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992). Judge Lifland did acknowledge, however, that Code § 365(d)(3) "represents a form of special legislation somewhat out of synch with other policy considerations of the Code." *Id.* at 873 n. 3 (citation omitted).

Judge Sotomayor, affirming Judge Lifland's decision in *R.H. Macy,* found Judge Goettel's policy arguments in *Child World* "very persuasive" but concluded that it was a "judicial philosophy issue as to whether or not or how much the clear, plain meaning of words should be strained because of policy questions or legislative history." *R.H. Macy, supra,* 1994 WL 482948 at *13. She found the language unambiguous and clear and concluded that the majority of courts upheld Judge Lifland's reading of the Code that payment be made based on the billing date. *See id.*

Since Bankruptcy Judges Lifland and Schwartzberg rendered their decisions, there have been a number of other courts that have considered the application of Code § 365(d)(3) under similar circumstances. *See e.g. In re Almac's Inc.,* 167 B.R. 4, 8 (Bankr.

D.R.I.1994) (Court joined with the 'substantial majority of the courts' which hold that 'rent should be prorated … regardless of the fortuity of the billing date.'); *In re All for A Dollar, Inc.,* 174 B.R. 358, 362 (Bankr. D.Mass.1994) ("Court adopts the majority view which calculates a debtor's obligation under a lease during the postpetition, prerejection period on a prorated basis."); *In re William Schneider, Inc.,* 175 B.R. 769 (S.D.Fla.1994); *In re Warehouse Club, Inc.,* 184 B.R. 316 (Bankr.N.D.Ill.1995). These cases, without exception, have followed Judge Goettel's decision in *Child World,* which reversed Judge Schwartzberg, and have calculated postpetition, prerejection obligations under a nonresidential real property lease on a prorated basis.

The courts that have relied on the billing date in determining the method of payment of the debtor's "obligation" assert that the language of Code § 365(d)(3) is unambiguous and requires strict adherence to the terms of the lease. Although acknowledging the fact that awarding payments pursuant to the terms of the lease may produce arbitrary results depending on the date the petition was filed, the courts have declined to alter what appears clear in the language of Code § 365(d)(3). *See e.g. In re The Krystal Co.,* 194 B.R. 161, 164 (Bankr.E.D.Tenn.1996); *R.H. Macy, supra,* 1994 WL 482948 at *13 ("The legislative solution to a problem need not necessarily be a perfect solution …"); *In re Appletree Markets,* 139 B.R. 417, 420 (Bankr.S.D.Tex.1992) ('The fact that Congress may not have foreseen all of the consequences of a statutory enactment is not sufficient reason for refusing to give effect to its plain meaning.' (quoting *Union Bank v. Wolas,* 502 U.S. 151, 156–58, 112 S.Ct. 527, 531, 116 L.Ed.2d 514 (1991)).) However, as pointed out by Judge Lifland in a subsequent decision in the *R.H. Macy* case, "[E]ven within the fluctuating walls of the 'plain meaning' fortress (citations omitted) a court should not resolve questions of statutory interpretation so that a particular Bankruptcy Code section conflicts and disturbs the overall purpose and function of the Code." *In re R.H. Macy & Co., Inc.,* 170 B.R. 69, 73 (Bankr.S.D.N.Y.1994) (citing *680 Fifth Ave.*

*Assocs. v. Mutual Benefit Life Ins. Co. (In re 680 Fifth Ave. Assocs.),* 156 B.R. 726, 734 n. 12 (Bankr.S.D.N.Y.), *aff'd* 169 B.R. 22 (S.D.N.Y.1993) (Noting that in recent cases interpreting the Bankruptcy Code the Supreme Court has tempered its application of the plain meaning rule, particularly when it would effect a major change in practice under the Code as it existed at the time, unless there is support for such a change in the legislative history.)).

In this case, the legislative history is limited to the remarks of Senator Hatch. Absent from his remarks is any reference to the landlord's responsibility for paying taxes on the real property in connection with the services being provided to the debtor. Instead, Senator Hatch expresses concern that the trustee [debtor in possession] has stopped making payments such as *rent* and *common area charges,* as well as *charges for services rendered* to the debtor. These are current expenses that debtor should anticipate incurring on a monthly basis in connection with its day-to-day operations. On the other hand, real estate taxes are generally accrued expenses which, when ultimately billed, are for a period encompassing several months, either retroactively or prospectively.

■ Prior to the enactment of Code § 365(d)(3), it was the practice of the courts to prorate real estate taxes accruing only during the postpetition, prerejection period regardless of when they were billed. *Schneider, supra,* 175 B.R. at 772 (citations omitted). This practice is commensurate with the overall purpose of the Code to afford a Chapter 11 debtor the means and opportunity to reorganize while at the same time balancing the rights of all creditors seeking to recover on their respective claims. Congress, in enacting Code § 365(d)(3), recognized the inequities of requiring a landlord, who in most instances was an "involuntary" postpetition creditor of the debtor, to establish a benefit to the estate of the debtor pursuant to Code § 503(b)(1) before being entitled to a claim for administrative expenses. The landlord's burden was often an impossible one to meet, particularly in the situation where the debtor had already vacated the premises but had not as yet determined whether or not to reject the lease. In addressing this inequity, the remedy envisioned by Congress should not be expanded to allow the landlord to recover a windfall when the lease provides for the reimbursement of taxes for a period following rejection by the debtor. Nor should the landlord be placed in a position of having a priority claim with respect to the payment of taxes on the property for a time prepetition when the relationship between landlord and tenant was a voluntary one based on the lease.

The Court concludes that by requiring that the Debtor fulfill its obligations set forth in the lease on a pro rata basis during the postpetition, prerejection period, the interests of both debtor and landlord, as well as other creditors, are served.

As the Court has concluded that it is inappropriate to rely solely on the billing date to determine the extent of Debtor's obligations to reimburse Eton for its payment of real estate taxes, it is unnecessary for the Court to address whether the full amount of the obligation arose pre- or postpetition based on the Statement submitted to the Debtor on or about August 23, 1995, requiring payment within 30 days.

Based on the foregoing, it is hereby

ORDERED that the Debtor's motion which sought an extension of time to assume or reject the Lease with Eton through March 20, 1996, is granted *nunc pro tunc* provided that the Debtors make payment to Eton of Debtor's 51.3% share of taxes, prorated on a monthly or per diem basis as appropriate, for the period from November 20, 1995 through March 20, 1996, within ten (10) days of the date of this Order,[2] and remains current on its obligation for any subsequent period until such time as said Lease is rejected pursuant to Code § 365(d)(3), and this Court's recent decision in *In re New Almacs, Inc.,* 196 B.R. 244 (N.D.N.Y.1996); it is further

---

**2.** To the extent that Eton has not received a bill for some portion of the taxes for 1995–96, the Court deems it appropriate to use the prior year's amounts unless it is presented with evidence to the contrary which would warrant scheduling an evidentiary hearing.

ORDERED that Eton's cross-motion seeking reimbursement for Eton's payment of real property taxes for 1994–95 is granted to the extent described in the aforementioned paragraph; and it is further

ORDERED that Eton be allowed an administrative expense claim pursuant to Code § 507(a)(1) for Debtor's 51.3% share of taxes paid by Eton, on a prorated basis for the period from September 20, 1995 through November 19, 1995. *See id.*