**NATIONAL TERMINALS
CORPORATION,
Appellant,**

v.

**HANDY ANDY HOME IMPROVEMENT
CENTERS, INC., Appellee.**

No. 96 C 4718.
Bankruptcy No. 95 B 21655.

United States District Court,
N.D. Illinois,
Eastern Division.

Sept. 30, 1997.

Rusty A. Payton, Katz, Randall & Weinberg, Chicago, IL, for appellant.

John James Voorhees, Jr., Lawrence K. Snider, Mayer, Brown & Platt, Chicago, IL, Michael P. Richman, Mayer Brown & Platt, New York City, for appellee.

### MEMORANDUM OPINION AND ORDER

ANN CLAIRE WILLIAMS, District Judge.

Appellant National Terminals Corporation, the lessor, appeals a June 25, 1996 order of the bankruptcy court. The bankruptcy court required Appellee Handy Andy Home Improvement Center, Inc., the lessee, to pay only the prorated portion of real estate taxes which arose after the involuntary petition for relief was filed under Chapter 11, but before Handy Andy Home Improvement Center rejected the lease. National argues that the bankruptcy court erred in its analysis of the terms of the Lease and its application of 11 U.S.C. § 365(d)(3) of the Bankruptcy Code, and requests that this court reverse the decision of the bankruptcy court. For the following reasons, the court affirms the decision of the bankruptcy court.

### Background

On or about July 31, 1986, Handy Andy Home Improvement Centers, Inc. ("Handy Andy"), the lessee, and North Pier Terminal Co., predecessor in interest to National Terminals Corporation ("National"), the lessor, entered into a commercial lease ("Lease") for certain nonresidential real property located at 2300 Maywood Drive, Bellwood, Illinois ("the Property"). (R. 5 at 1.) [1] The Lease term was from October 1, 1986 through September 30, 1996. (R. 5 at 2.)

Pursuant to the lease, Handy Andy was obligated to pay "base rent" as well as "additional rent." Handy Andy agreed to pay "base rent" in the amount of $1.85 per square foot monthly, or $36,075.00. (R. 5 at 2.)

---

1. Throughout this memorandum "R. 5" refers to the stipulation of facts.

Handy Andy also agreed to pay "additional rent," which included real estate taxes, certain assessments, and all utilities. (R. 5 at 2.) Paragraph 5(a) of the Lease provides as follows:

As additional rent for the demised premises, Lessee agrees to pay all general and special real estate taxes and assessments . . . accruing during the term of this Lease and any extension thereof, provided, however, that the general real estate taxes levied against the demised premises shall be prorated between Lessor and Lessee as of the date of commencement of possession in the year 1986 and as of the date of expiration for the last year of the term of this Lease on the basis of the then last available tax bills, and to be reprorated when the final tax bill is issued.

(R. 5 at 2.) Paragraph 11(b) of the Lease also provides that Handy Andy was only obligated to pay the prorated portion of additional rent in the event that the property was destroyed by fire or other casualty and the Lease was terminated. (R. 5, Ex. 1.)

Under the lease, Handy Andy was obligated to make monthly deposits of 1/12 the real estate taxes assessed and levied into a "Tax Account." Paragraph 5(b) of the Lease provides as follows:

Lessee shall always have on deposit in the Tax Account sums equal to the accrued real estate taxes levied and assessed. It is understood that Lessee will be responsible for all taxes accrued during the term hereof upon termination of this Lease and will pay the amounts that may be due on reproration when the actual amounts are ascertained.

(R. 5 at 2.)

Under Illinois law, taxes are assessed on a calender year basis and are billed the following year. 35 ILCS 200/1–155; 35 ILCS 100/21–30. The taxing authority generally bills the property owner in two installments. 35 ILCS 200/20–210. For example, sometime before November 1995, the taxing authority sent National a second tax bill, the "second installment," setting out the amount of estimated taxes billed in the first installment and the full balance of taxes due for 1994. (R. 5 at 3.) In February 1996, the taxing authority sent National an estimated tax bill, the "first installment," setting out half of the expected taxes for the prior year, 1995. (R. 5 at 4.)

On October 12, 1995, an involuntary petition for relief was filed against Handy Andy under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.* (R. 5 at 1.) Prior to the filing of the petition, the taxing authority sent National the second installment of real estate tax bills for taxes which accrued against the Property during the second half of 1994. (R. 5 at 3.) Generally, National's practice was to pay the real estate tax bills and then submit an invoice to Handy Andy for reimbursement.[2] On October 23, 1995, National submitted a copy of the second installment 1994 real estate tax bills to Handy Andy along with an invoice for additional rent in the amount of $161,359.23. (R. 5 at 3.) National paid the second installment 1994 real estate tax bills on October 24, 1995. (R. 5 at 4.) This bill was due to the taxing authority on November 3, 1995. (R. 5, Ex. 2). Handy Andy never reimbursed National for paying this second installment for 1994 real estate taxes.

On November 1, 1995, Handy Andy consented to the entry of an order for relief in response to the involuntary petition and became a debtor in possession ("petition date"). (R. 5 at 1.)

In February of 1996, National received the first installment 1995 real estate tax bills

---

2. Although this was the practice of National, paragraph 5(d) of the Lease provides:

Lessor shall deliver to Lessee a bona fide bill for real estate taxes, directly levied against the demised premises and issued by the applicable taxing authority, at least thirty (30) days prior to when payment is due or within ten (10) days after said bill is received by Lessor, whichever is earlier. Lessee shall pay, out of the Tax Account (to the extent funds therein are sufficient) such taxes directly to the taxing authority on the later of (I) ten (10) days before the date on which such taxes are due, or (ii) twenty (20) days after Lessee's receipt of said bill or statement; provided, however, that if payment of such Taxes is permitted by statute or ordinance to be made in installments, Lessee, at its election, shall pay each installment of such taxes at the applicable time as provided above.

which accrued against the Property during the first half of 1995. (Appellee's Br. at 3; Reply Br. of Appellant at 2.) National paid the first installment on or about February 27, 1996. (R. 5 at 4.) On February 28, 1996, National requested Handy Andy to pay additional rent in the amount equal to the first installment 1995 real estate tax bills, totaling $148,431.41. (R. 5 at 4, Ex. 5, 6.) The first installment was due on March 1, 1996. (R. 5, Ex. 2.) Handy Andy never reimbursed National for paying the first installment 1995 real estate taxes.

Because Handy Andy did not reimburse National for the second installment 1994 tax bills and the first installment 1995 tax bills, National filed a motion seeking *inter alia* to compel Handy Andy to comply with § 365(d)(3) of the Code and pay National additional rent in the amount of $309,790.64 for both installments. (*See* R. 1, 2.) [3]

On April 17, 1996, the bankruptcy court entered an order approving the rejection of the lease ("rejection date"). (R. 6 at 1.) [4]

### Decision of Bankruptcy Court

The issue before the bankruptcy court was whether Handy Andy was required under § 365(d)(3) to pay the second installment 1994 real estate taxes and the first installment 1995 real estate taxes, which became due after Handy Andy consented to the order for relief on November 1, 1995 [5] but before the bankruptcy court entered an order approving the rejection of the lease on April 17, 1996 ("the post-petition, pre-rejection period"). During the post-petition, pre-rejection period

> [t]he trustee shall timely perform all the obligations of the debtor, except those specified in section 365(b)(2) [6], arising from

and after the order for relief under any unexpired lease of non-residential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) [7] of this title.

11 U.S.C. § 365(d)(3) (1984). The bankruptcy court held that Handy Andy was not obligated to pay the second installment 1994 real estate tax bills or the first installment 1995 real estate tax bills because those taxes accrued prior to the petition date. However, the bankruptcy court held that Handy Andy was obligated to pay the prorated portion of real estate taxes which accrued during the post-petition, pre-rejection period; in other words, Handy Andy had to pay the real estate taxes that accrued on a daily basis between November 1, 1995 and April 17, 1996. [8]

The bankruptcy court determined that the language of § 365(d)(3) is ambiguous. (R. 6 at 9.) The bankruptcy court stated that the provision "does not address tax payments directly, nor does it define which obligations are considered to arise after the order of relief." (R. 6 at 9.) In order to determine what obligations arose under the terms of the Lease and what Handy Andy was obligated to pay under § 365(d)(3), the bankruptcy court looked at the parties' intent under the contract. The court concluded, based upon paragraphs 11 and 5(a) of the Lease, that the parties intended to prorate the real estate taxes in the event the Lease was terminated. (R. 6 at 10.) Therefore, the bankruptcy court held that liability did not arise "from the date of issuance of the tax bill but rather on a daily basis throughout the lease term." (R. 6 at 10.)

---

3. "R. 1" is the Amended Mot. to Compel; "R. 2" is the Supp. Mot. to Compel.

4. Throughout this memorandum, "R. 6" refers to the bankruptcy court's Mem. Op. dated May 22, 1996.

5. Although the petition for relief was filed against Handy Andy on October 12, 1995, the "petition" date is November 1, 1995 because Handy Andy consented to the order for relief on this date.

6. Section 365(b)(2) provides exceptions for when a trustee may assume an executory contract or unexpired lease which is in default. *See* 11 U.S.C. 365(b)(2).

7. Section 503(b)(1) provides for the allowance of administrative expenses, including "the actual, necessary costs and expenses of preserving the estate." *11 U.S.C. § 503(b)(1).*

8. National would not have billed Handy Andy for the real estate taxes during this time period until the second half of 1996 and the first half of 1997.

Furthermore, the bankruptcy court found that prorating real estate taxes under § 365(d)(3) was appropriate based on legislative history and current case law. (R. 6 at 12–13, 15–16.) The bankruptcy court held that the purpose of § 365(d)(3) was to provide landlords with current payment for current services; it was not intended to give landlords a "superpriority" for all of the debtor's defaults. (R. 6 at 13.)

### Standard of Review

■ The bankruptcy court's legal conclusions are reviewed de novo. *Newman v. McCrory Corp. (In re McCrory Corp.)*, 210 B.R. 934, 935 (S.D.N.Y.1997); *Schneider & Reiff v. William Schneider, Inc. (In re William Schneider, Inc.)*, 175 B.R. 769, 771 (S.D.Fla.1994). Questions of fact are reviewed under a clearly erroneous standard. *In re William Schneider*, 175 B.R. at 771. Because both parties have stipulated to the facts, this court is only concerned with the bankruptcy court's legal conclusions drawn from those facts. *See Inland's Monthly Income Fund, L.P. v. Duckwall–ALCO Stores, Inc. (In re Duckwall–ALCO Stores, Inc.)*, 150 B.R. 965, 969 (D.Kan.1993).

### Analysis

■ The issue before this court is whether the bankruptcy court erred in determining that Handy Andy was only obligated to pay the prorated portion of real estate taxes which accrued during the post-petition, pre-rejection period, November 1, 1995 to April 17, 1996, rather than the full amount of both the second installment 1994 real estate taxes and the first installment 1995 real estate taxes under § 365(d)(3).

The parties dispute what real estate taxes Handy Andy is obligated to pay under § 365(d)(3). National believes that Handy Andy is obligated to pay the full amount of both the second installment 1994 real estate taxes, which became due on November 3, 1995, and the first installment 1995 real estate taxes, which became due on March 1, 1996. National argues that because the two

installments became due during the post-petition, pre-rejection period, Handy Andy is obligated to pay National for the full amount of both the 1994 and 1995 installments. Furthermore, National argues that the bankruptcy court erred when it determined that the parties intended to prorate the real estate taxes based on the terms of the lease.

Handy Andy believes that its obligation to pay real estate taxes accrued on a daily basis. Based upon this theory, Handy Andy's obligation to pay the 1994 and 1995 installments accrued during the second half of 1994 and the first half of 1995, which was before the November 1, 1995 petition date. Handy Andy, therefore, argues that it is not obligated to pay the 1994 and 1995 installments. Handy Andy believes that it is only obligated to pay the prorated portion of real estate taxes which accrued on a daily basis during the post-petition, pre-rejection period from November 1, 1995 to April 17, 1996.

Courts are split on this issue. The majority of courts apply the "accrual" theory to obligations which arise under § 365(d)(3). Under this theory, the debtor's obligation to pay real estate taxes extends only to those taxes which accrued during the post-petition, pre-rejection period, regardless of the billing date. *See, e.g., In re McCrory*, 210 B.R. at 937; *Child World, Inc. v. Campbell/Massachusetts (In re Child World, Inc.)*, 161 B.R. 571, 576–77 (S.D.N.Y.1993) [9]; *In re Victory Markets, Inc.*, 196 B.R. 6, 10 (Bankr. N.D.N.Y.1996); *In re Warehouse Club, Inc.*, 184 B.R. 316, 317 (Bankr.N.D.Ill.1995); *In re All For A Dollar, Inc.*, 174 B.R. 358, 361–62 (Bankr.D.Mass.1994); *In re Almac's, Inc.*, 167 B.R. 4, 7 (Bankr.D.R.I.1994). The minority of courts apply a strict "billing date" approach in which the debtor's obligation to pay the real estate taxes arises on the day the taxes are due. *See e.g., In re Duckwall–ALCO*, 150 B.R. at 974–76; *In re Krystal Co.*, 194 B.R. 161, 162–64 (Bankr.E.D.Tenn. 1996).

Courts applying the "accrual theory" find that the language of § 365(d)(3) is ambiguous with respect to when the debtor's "obli-

---

**9.** National asserts that the bankruptcy court's reliance on this case misses the mark because the taxes at issue were billed prospectively. Howev-

er, the Court finds the reasoning of *In re Child World*, 161 B.R. 571, and others, *see In re McCrory*, 210 B.R. 934, to be persuasive.

gation" arises to reimburse the landlord for real estate taxes. *See, e.g., In re McCrory,* 210 B.R. at 937; *In re Best Products,* 206 B.R. at 407. As a result of the ambiguity in the statute, most courts look to the pre-amendment practice under the Code, legislative intent, and other rules of statutory construction. *See, e.g., In re McCrory,* 210 B.R. at 937 (recognizing pre-amendment practice of prorating real estate taxes); *In re Best Products,* 206 B.R. at 407 (provision must be construed to produce rational results); *In re All For A Dollar,* 174 B.R. at 361 (legislature intended to provide landlord with current payment for current services).

Prior to the enactment of § 365(d)(3), post-petition, pre-rejection lease obligations were handled as administrative expenses under 11 U.S.C. § 503(b)(1). *In re All For A Dollar,* 174 B.R. at 360 (citing generally, 3 Collier on Bankruptcy § 503.04 at 524–28 (15th Ed.1991)). "Administrative expenses include, 'the actual, necessary costs and expenses of preserving the estate.'" *In re Child World,* 161 B.R. at 574 (quoting 11 U.S.C. § 503(b)(1)). Under this provision, courts often prorated rent and real estate taxes accruing during the post-petition, pre-rejection period. *In re All For A Dollar,* 174 B.R. at 360 (citing among others *Field v. Herrell (In re J. Bain, Inc.),* 554 F.2d 255 (5th Cir.1977); *In re Lackow Brothers, Inc.,* 18 B.R. 770, 772 (Bankr.S.D.Fla.1982)). Congress gave administrative expenses priority status over all other unsecured claims. *In re Child World,* 161 B.R. at 574. Congress hoped that by giving administrative expenses priority status, creditors would be more willing to do business with the debtor in possession, thereby helping the debtor rehabilitate the business, benefitting all of the debtor's creditors. *Id.*

Landlords, however, were a uniquely situated class of creditors under the Code because they were often forced to provide services to the debtor-tenant until the lease was assumed or rejected. *See* H.R.Conf. Rep. No. 882, 98th Cong., 2d Sess. (1984), reprinted in 1984 U.S.C.C.A.N. 576. Additionally, landlords were only entitled to recover the "reasonable value" of the debtor's "actual use" of the premises, and the bankruptcy court had discretion to delay payment until after a plan had been confirmed. *In re Best Products,* 206 B.R. at 405 (citing Joshua Fruchter, To Bind or Not to Bind—Bankruptcy Code § 365(d)(3): Statutory Minefield, 68 Am. Bankr.L.J. 437, 438 (1994)). Therefore, landlords were often forced to provide services without compensation.

Congress enacted § 365(d)(3) with little legislative history. *In re Child World,* 161 B.R. at 575 n. 6. Senator Hatch, who was the only legislator to comment on the amendment, acknowledged

> that during the time the debtor has vacated [the] space but has not yet decided whether to assume or reject the lease, the trustee has stopped making payments due under the lease. These payments include rent due the landlord and common area charges.... In this situation the landlord is forced to provide current services ... without current payment.

H.R.Conf. Rep. No. 882, 98th Cong., 2d Sess. Based on Senator Hatch's comments, the majority of courts conclude that § 365(d)(3) was intended to prevent landlords from being "forced to provide current services ... without current payment." *See In re Best Products,* 206 B.R. at 407; *In re Warehouse Club,* 184 B.R. at 317 (purpose of § 365(d)(3) was to prevent landlords from becoming "involuntary post-petition creditors of the bankruptcy estate"). Courts applying the accrual theory reason that taxes which accrue prior to the petition date are not a "current expense." *E.g., In re Child World,* 161 B.R. at 575; *In re Warehouse Club,* 184 B.R. at 317. The debtor-tenant's occupancy of the property does not increase the landlord's burden for last years taxes. *In re Warehouse Club,* 184 B.R. at 317. The current expense is the prorated portion of real estate taxes that accrue during the post-petition, pre-rejection period. These courts also hold that because Congress did not specifically address whether obligations under the lease should be prorated, Congress did not intend to alter the pre-amendment practice of prorating real estate taxes during the post-petition, pre-rejection period. *E.g., In re McCrory,* 210 B.R. at 939; *In re All For A Dollar,* 174 B.R. at 360.

Moreover, courts applying the accrual theory consider issues of fairness and equity in interpreting the language of § 365(d)(3). *See, e.g., In re Best Products,* 206 B.R. at 407; *In re Victory Markets,* 196 B.R. at 10. "Reliance strictly on the billing date would result in a windfall either to the landlord or to the debtor-tenant." *In re McCrory,* 210 B.R. at 940. For example, in *In re McCrory,* the real estate taxes were billed prospectively for the current year. 210 B.R. at 940. The bill for real estate taxes came due during the post-petition, pre-rejection period. *Id.* The court held that the billing date approach would have resulted in a windfall to the landlord because payment would have covered a substantial period after the debtor rejected the lease. *Id.*

Alternatively, courts applying the billing date approach find that the language of § 365(d)(3) is unambiguous. *See e.g., In re Duckwall–ALCO,* 150 B.R. at 974–76; *In re Krystal,* 194 B.R. at 162–64; *In re Child World,* 150 B.R. at 331–32. In looking at the plain language, these courts find the terms "obligation" and "arise" to be sufficiently clear as to require payment of real estate taxes in full as they come due under the terms of the Lease. *See In re Krystal,* 194 B.R. at 162; *In re F & M Distribs.,* 197 B.R. at 831–32. In *In re Krystal,* the court held that the plain language "notwithstanding § 503(b)(1)" supports the conclusion that Congress intended to alter the pre-amendment practice of prorating real estate taxes under the Code. 194 B.R. at 163. The court stated that "the 'notwithstanding' phrase means that the obligations in question are to be paid 'in spite of' the operation of § 503(b)(1), which would otherwise limit postpetition [sic] payments to those necessary for 'preserving the estate.'" *Id.* (citation omitted). Additionally, the court held that the plain language requirement that the debtor "timely perform" all obligations for

the landlord signified Congress' support for the "billing date" approach. *Id.; see also, In re F & M Distribs.,* 197 B.R. at 833 (focusing on Senator Hatch's comment that the "timely performance requirement will insure that debtor-tenants pay [these] charges on time").

The minority courts apply the strict billing date approach despite the potential for unfairness and inequity. *See, e.g., In re F & M Distribs.,* 197 B.R. at 832; *In re Krystal,* 194 B.R. at 164; *In re R.H. Macy,* 152 B.R. at 874. While recognizing the potential windfall that a landlord or debtor could incur under a strict billing date approach, these courts adhere to the "plain language" of the statute. *Id.* In *In re F & M Distributors,* the court reasoned that considerations of policy and fairness should be left to the legislature and that "fairness is not a consideration unless the statute so states." 197 B.R. at 832–33. The court in *In re Krystal* concluded that because Congress enacted the amendment to provide greater protection for landlords who were burdened by the unjustified costs, Congress did not intend to limit the debtor's liability under the newly amended Code. 194 B.R. at 163.[10]

This court applies the "accrual" theory adopted by the majority of courts. The language of § 365(d)(3) is unclear as to when the debtor's obligation arises to pay real estate taxes. *E.g., In re McCrory,* 210 B.R. at 939; *In re Child World,* 161 B.R. at 576–77; *In re Warehouse Club,* 184 B.R. at 317. Even if the court were to find the language sufficiently clear, a literal interpretation cannot be applied if it produces results which are at odds with legislative intent. *See United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). Therefore, legislative history and policy considerations are controlling in interpreting § 365(d)(3).

**10.** Another collection of courts in the minority, recognize the accrual theory implicitly, but come to the same result as courts applying the strict billing date approach. *See In re Best Products,* 206 B.R. at 406 (recognizing the three approaches); *see also, In re R.H. Macy,* 152 B.R. at 873. These courts recognize that taxes accrue on a daily basis throughout the year, however, the debtor-in-possession under the lease has no statutory obligation to pay an assessment, made by the relevant taxing authority. Instead, the debtor has a contractual obligation to remit to the landlord additional rent. This obligation does not arise until the landlord submits the bill to the debtor. *In re Best,* 206 B.R. at 406; *see also, In re R.H. Macy,* 152 B.R. at 873; Fruchter, *supra,* at 472.

**156**

In recent cases interpreting the Bankruptcy Code, the Supreme Court has counseled that "courts should be 'reluctant to accept arguments that would interpret the Code, however vague the particular language ... might be, to effect a major change in pre-Code practice that is not the subject of at least some discussion in the legislative history.'" *In re Joseph C. Spiess Co.*, 145 B.R. 597, 602 (Bankr.N.D.Ill.1992) (quoting *Dewsnup v. Timm*, 502 U.S. 410, 419, 112 S.Ct. 773, 779, 116 L.Ed.2d 903 (1992)); *see also, McCrory*, 210 B.R. at 939 (recognizing that the Supreme Court has tempered its application of the plain meaning rule under the Code). While legislative history reveals that Congress intended to provide landlords with current payments for current services, Congress did not specifically address whether obligations under the lease should be prorated. *See* H.R.Conf. Rep. No. 882, 98th Cong., 2d Sess.; *see also, In re All For A Dollar*, 174 B.R. at 360 (Congress did not specifically address the issue of allocation). Because legislative history is silent on this point, the court joins the majority in adhering to the longstanding practice of prorating real estate taxes during the post-petition, pre-rejection period.

Prorating real estate taxes during the post-petition, pre-rejection period serves the purpose that Congress intended, to provide landlords with current payment for current services, without granting a windfall to the landlord or to the tenant. *In re McCrory*, 210 B.R. at 939–40; *In re Warehouse Club*, 184 B.R. at 317. Congress intended to provide greater protections for landlords. The billing date approach subverts this purpose. For example, when the billing date falls before the petition for relief, the landlord would not receive any reimbursement for the real estate taxes which accrued against the property prior to the filing of the petition or which accrued against the property during the post-petition, pre-rejection period. Under the billing date approach, the tenant would not be obligated to pay any portion of these real estate taxes under § 365(d)(3), because the tenants "obligation" to pay occurred prior to the petition.

Moreover, application of the billing date approach could potentially provide the tenant with a means of avoiding the obligation to pay real estate taxes completely under § 365(d)(3). In cases where the tenant files a voluntary petition for relief, the tenant could file the petition after the billing date to avoid paying real estate taxes under § 365(d)(3). The billing date approach could potentially leave the landlord without any payment for the services provided during the post-petition, pre-rejection period. This result is one that Congress specifically intended to remedy by passing the amendments.

Furthermore, the court rejects the approach of looking to the terms of the lease to determine if real estate taxes should be prorated for the post-petition, pre-rejection period based upon who the tenant was obligated to pay. Although Handy Andy was obligated to pay the taxing authority directly under the terms of the lease, Handy Andy paid National. The court rejects the argument that real estate taxes should be prorated only if the tenant is obligated to pay the taxing authority rather than the landlord directly. The majority of courts hold that real estate taxes should be prorated without determining who the debtor was obligated to pay. *See generally, e.g., In re McCrory*, 210 B.R. 934; *In re Child World, Inc.*, 161 B.R. 571; *In re Victory Markets*, 196 B.R. 6; *In re Warehouse Club*, 184 B.R. 316; *In re All For A Dollar*, 174 B.R. 358.

Because real estate taxes generally accrue against the property on a daily basis, the accrual theory should be applied consistently despite who the tenant is obligated to pay. The plain language of § 365(d)(3) and the legislative history do not support such a distinction. Additionally, the court has the same concerns with issues of fairness and equity in applying § 365(d)(3) as discussed above.

The assumption under § 365(d)(3) is that the tenant is obligated to pay the prorated portion of real estate taxes during the post-petition, pre-rejection period even where there is no evidence in the lease that the parties intended to prorate the real estate taxes. While the parties may be free under the terms of the lease to change this

obligation, the court will not assume this is the case unless the parties clearly express this intent in the terms of the lease. The language of the lease between National and Handy Andy does not clearly alter this obligation; therefore, Handy Andy is only obligated under § 365(d)(3) to pay the prorated portion of real estate taxes which accrued during the post-petition, pre-rejection period.

### Conclusion

For the reasons set forth above, the court upholds the decision of the bankruptcy court.