

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-10-2001

# In Re: M Ward v.

Precedential or Non-Precedential:

Docket 99-6140

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"In Re: M Ward v." (2001). *2001 Decisions.* Paper 232.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/232

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed October 10, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 99-6140

IN RE: MONTGOMERY WARD HOLDING CORP.
Debtor

CENTERPOINT PROPERTIES
Appellant

v.

MONTGOMERY WARD HOLDING CORP.

On Appeal From the United States District Court
For the District of Delaware
(D.C. Civil Action No. 98-cv-00338)
District Judge: Honorable Joseph J. Farnan, Jr.

Argued April 3, 2001

BEFORE: MANSMANN, STAPLETON and GREENBERG,
Circuit Judges

(Opinion Filed: October 10, 2001)

        Richard A. Chesley
        Michael J. Gray (Argued)
        Jones, Day, Reavis & Pogue
        77 West Wacker Drive
        Chicago, IL 60601
         Attorneys for Appellee

          J. Mark Fisher (Argued)
          William M. Aguiar
          Schiff, Hardin & Waite
          6600 Sears Tower
          Chicago, IL 60606
           and
          Steven K. Kortanek
          Klehr, Harrison, Harvey, Branzburg
           & Ellers
          919 North Market Street,
           Suite 1000
          Wilmington, DE 19801
           Attorneys for Appellant

OPINION OF THE COURT

STAPLETON, Circuit Judge:

This appeal presents us with a narrow question of statutory interpretation. Section 365 of Title 11 requires that a bankruptcy trustee fulfill all the obligations that arise under a non-residential lease subsequent to the entry of the bankruptcy order and prior to the time that the lease is rejected. Under the terms of the non-residential lease entered by the debtor in this case, it was required to reimburse the landlord for all tax expenses attributable to the leased premises. The obligation to pay that reimbursement did not mature under the terms of the lease until after the order, although the landlord's liability for the taxes accrued in large part prior to the order. We must determine whether in these circumstances section 365 requires the bankruptcy trustee to make the entire payment called for in the lease.

I.

On September 7, 1995, Montgomery Ward Holding Corporation ("Montgomery Ward"), executed a lease on a commercial property in Illinois owned by CenterPoint Properties Trust ("CenterPoint"). Two of the provisions of the lease require Montgomery Ward to reimburse

2

CenterPoint for real estate taxes assessed on the premises. Section 6.1 of the lease states:

> Upon receipt of an invoice from [CenterPoint], [Montgomery Ward] further agrees to pay before any fine, penalty, or interest or cost may be added thereto for the nonpayment thereof, as Additional Rent for the Premises, all Taxes . . . levied, assessed or imposed upon the Premises or any part thereof accruing during the Term of this Lease, notwithstanding that such Taxes may not be due and payable until after the expiration of the Term of this Lease. . . .

An additional term of the Lease found in Section 6.3, provides for a "security deposit" mechanism which operates as follows:

> As security for [Montgomery Ward's] obligation to pay for Taxes assessed for 1996 and 1997, unless the same were otherwise paid by [Montgomery Ward] prior to the expiration of the Term, [Montgomery Ward] agrees to deposit with [CenterPoint], or such other entity as [CenterPoint] may designate, no later than thirty (30) days prior to the expiration of the Term an amount equal to one hundred percent (100%) of the most recent ascertainable Taxes. . . . [Montgomery Ward's] payment of the deposit shall be credited against the Taxes due. . . .

Thus, two separate lease provisions obligate Montgomery Ward to reimburse CenterPoint for tax liabilities incurred during the term of the lease.

On July 7, 1997, Montgomery Ward filed for bankruptcy under Chapter 11. Montgomery Ward continued to make use of the premises as a debtor-in-possession pursuant to SS 1107 and 1108 of the Bankruptcy Code, but it neither assumed nor rejected the lease prior to the lease's expiration on September 1, 1997.

On July 11, 1997, CenterPoint sent three invoices to Montgomery Ward. The first invoice was for a first installment of 1996 taxes (payable in 1997) in the amount of $320,404.40. The second invoice was for an estimated second installment of 1996 taxes in the amount of

3

$320,569.70. The third invoice was issued pursuant to Section 6.3 of the lease and covered the 1997 taxes. This was in the amount of $426,729.87.

Montgomery Ward did not remit payment for either of the first two invoices, but remitted $96,584.95 as payment for the third invoice. This amount represented the prorated portion of taxes attributable to the period subsequent to Montgomery Ward's petition for bankruptcy relief. Montgomery Ward took the position that all taxes attributable to a pre-petition period constituted unsecured claims.[1]

On September 15, 1997, CenterPoint filed a motion pursuant to 11 U.S.C. S 365(d)(3) in the Bankruptcy Court for the District of Delaware seeking payment in full of Montgomery Ward's tax reimbursement obligations pursuant to the lease. Section 365(d)(3) reads, in relevant part:

> The trustee shall timely perform all the obligations of the debtor, except those specified in section 365(b)(2), arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title. The court may extend, for cause, the time for performance of any such obligation that arises within 60 days after the date of the order for relief, but the time for performance shall not be extended beyond such 60-day period.

CenterPoint argued that all the invoices were payable immediately as "obligations of [Montgomery Ward] . . . arising from . . . the lease" after the order for relief.[2]

_____

1. As the Seventh Circuit noted in In re Handy Andy Home Improvement Centers, 144 F.3d 1125, 1126 (7th Cir. 1998), recorded decisions often refer to "pre-petition" and "post-petition" periods rather than a "pre-order" and "post-order" periods. The latter terms are technically correct.

2. While section 6.3 did not explicitly contemplate an invoice to trigger payment, it did contemplate that the payment obligation would arise at a fixed date no later than thirty days prior to the expiration of the lease.
In the absence of an invoice from CenterPoint, the obligation to make payment would have arisen within the post-order, pre-rejection period.

Montgomery Ward argued that the statute was ambiguous and that the jurisprudence of the Third Circuit required that it should pay only the taxes attributable to the period after the order.

The Bankruptcy Court decided in favor of Montgomery Ward. CenterPoint appealed this decision to the District Court for the District of Delaware, which affirmed the decision of the Bankruptcy Court. CenterPoint again appeals.

The Bankruptcy Court had subject matter jurisdiction pursuant to 28 U.S.C. S 157 because CenterPoint's claim arose in the Chapter 11 bankruptcy case filed by Montgomery Ward. The District Court had appellate jurisdiction over the Bankruptcy Court's final judgment, order, and decree pursuant to 28 U.S.C. SS 158(a) and 1334(a). This Court has appellate jurisdiction to review the final order of the District Court pursuant to 28 U.S.C. SS 158(d) and 1291. We exercise plenary review over the legal question of the proper interpretation of a statute. In re McDonald, 205 F.3d 606, 609 (3d Cir. 2000).

II.

Section 365(d)(3) mandates that "the trustee shall timely perform all the obligations of the debtor . . . arising from and after the order for relief under any unexpired lease . . . , until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title." 11 U.S.C. S 365(d)(3). There is, of course, a syntactical ambiguity in this text. It is not clear, as a purely formal matter, whether the preposition "from" should be read to modify the most proximate noun, "order," or the more remote, "lease." Nevertheless, we will interpret the preposition, as do both parties here, as modifying "lease," and the requirement as relating to obligations "arising from[,] and after the order of relief under[,] any unexpired lease." To require a trustee to perform all obligations "arising from . . . the order of relief " would make little sense and would be entirely inconsistent with the legislative history.

The issue for resolution then is what Congress meant when it referred to "obligations of the debtor arising under

5

a lease after the order of relief." In the factual context of this case, does it require payment by the trustee of all amounts that first become due and enforceable after the order under the terms of the lease? Or does it require the proration of such amounts based upon whether the landlord's obligation to pay the taxes accrued before or after the order?

We believe that to state these questions is to answer them. The clear and express intent of S 365(d)(3) is to require the trustee to perform the lease in accordance with its terms. To be consistent with this intent, any interpretation must look to the terms of the lease to determine both the nature of the "obligation" and when it "arises." If one accepts this premise, it is difficult to find a textual basis for a proration approach. On the other hand, an approach which calls for the trustee to perform obligations as they become due under the terms of the lease fits comfortably with the statutory text.

The term "obligation" is not defined in the Code, and it is thus apparently used in its commonly understood sense. Black's Law Dictionary defines it as "[t]hat which a person is bound to do or forebear; any duty imposed by law, promise, contract, relations of society, courtesy, kindness, etc." Black's Law Dictionary 968-69 (5th ed. 1979). In the context of a lease contract, it seems to us that the most straightforward understanding of an obligation is something that one is legally required to perform under the terms of the lease and that such an obligation arises when one becomes legally obligated to perform.

While Montgomery Ward insists that the statutory text is ambiguous, it has not advanced a plausible reading that seems to us consistent with that text. Several courts that have adopted a proration approach have suggested that such an approach can be reconciled with the text by interpreting "obligation" in light of the statutorily defined term "claim." See, e.g., Child World, Inc. v. Campbell/Massachusetts Trust (In re Child World, Inc.), 161 B.R. 571, 574 (S.D.N.Y. 1993). The tenant has an "obligation" when the landlord has a "claim." The Code, of course, defines "claim" as including an "unmatured right to

6

payment."[3] Thus, it is suggested, an "obligation" can arise before the tenant is obliged to perform. There are several difficulties with this suggestion. First, of course, Congress chose "obligation" and not "claim." See In re R.H. Macy & Co., 152 B.R. 869, 873 n.3 (S.D.N.Y. 1993) (suggesting that this makes S 365(d)(3) "somewhat out of synch" with the rest of the code). Second, this reading would render S 365(d)(3) superfluous. Unmatured rights to payment under a lease exist from the date the lease is executed, and no right to payment would ever arise under an unexpired lease after the order for relief. Finally, understanding "obligation" to be the corollary of "claim" does not produce the result for which those making the suggestion contend. Including unmatured rights to payment provides no analytical foundation for prorating the obligation to reimburse the landlord for taxes based on the date of the order and whether the landlord's obligation to pay those taxes accrued before or after the order was entered, an obligation that clearly does not arise under the lease. Indeed, any reading that provided an analytical foundation for such proration would be inconsistent with what would appear to be the fundamental tenet of the text -- that it is the terms of the lease that determine the obligation and when it arose.

Finding a straightforward interpretation that produces a rational result and no other reasonable interpretation consistent with the text, we are constrained to hold that S 365(d)(3) is not ambiguous. We thus have no justification for consulting legislative history. Nevertheless, we believe the limited legislative history of S 365(d)(3) is consistent with our reading of the text. The situation existing prior to the adoption of S 365(d)(3) has been accurately described in the literature as follows:

> Prior to 1984, landlords who leased premises to a [debtor-in-possession ("DIP")] sought payment of rent and other postpetition charges as administrative

_____

3. "Claim" is defined as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. S 101(5)(A).

7

expenses. Several factors, however, made collecting postpetition lease obligations under S 503 an unsatisfactory arrangement. First, a landlord had to comply with the formal and time-consuming procedure of an application, notice, and hearing. Second, a landlord could, upon proper proof, only recover the reasonable value of the DIP's actual use and occupancy of the premises. The "reasonable value-actual use" standard meant that (i) if a DIP physically occupied only a portion of the premises, it would, in turn, only be liable for the pro rata rent corresponding to the percentage of space actually occupied, and (ii) the court could limit a landlord's recovery to a fair market rate where the contract rate in the lease appeared clearly unreasonable. Finally, since bankruptcy courts exercise discretion with respect to the timing of the payment of administrative expenses, the court could delay payment of the amount awarded to the landlord until confirmation of a plan. The resulting loss of income imposed a heavy economic burden on landlords who were forced to provide ongoing services and space to the estate without receiving timely payment to satisfy their own cash obligations.

See Joshua Fruchter, To Bind or Not to Bind -- Bankruptcy Code S 365(d)(3): Statutory Minefield, 68 Am. Bankr. L.J. 437, 437 (1994) (emphasis in original; footnotes omitted) [herinafter "To Bind or Not to Bind"].

In 1984, Congress adopted S 365(d)(3) as a part of the Bankruptcy Amendments and Federal Judgship Act of 1984. Virtually all courts have agreed that it was intended to alleviate the above described burdens of landlords by requiring timely compliance with the terms of the lease. As Senator Orrin Hatch, a conferee on the originating act, put it:

This subtitle contains three major substantive provisions which are intended to remedy serious problems caused shopping centers and their solvent tenants by the administration of the bankruptcy code. . . . A second and related problem is that during the time the debtor has vacated space but has not yet decided whether to assume or reject the lease, the

8

trustee has stopped making payments under the lease. In this situation, the landlord is forced to provide current services -- the use of its property, utilities, security, and other services -- without current payment. No other creditor is put in this position. In addition, the other tenants often must increase their common area charge payments to compensate for the trustee's failure to make the required payments for the debtor. The bill would lessen these problems by requiring the trustee to perform all the obligations of the debtor under a lease of nonresidential real property at the time required in the lease. This timely performance requirement will insure that debtor-tenants pay their rent, common area, and other charges on time pending the trustee's assumption or rejection of the lease.

H.R. Rep. No. 882, 95th Cong., 2d Sess., reprinted in 1984 U.S.C.C.A.N. 576 (emphasis added). Senator Hatch's statements seem to us to confirm that Congress intended that the debtor in possession perform "all the obligations . . . at the time required in the lease." See In re Krystal Co., 194 B.R. 161, 164 (E.D. Tenn. 1996) (finding legislative history supports "time required in the lease" theory).4

We are not alone in holding that an obligation arises under a lease for the purposes of S 365(d)(3) when the legally enforceable duty to perform arises under that lease. See e.g., In re Koenig Sporting Goods, Inc., 203 F.3d 986 (6th Cir. 2000) (where rent for the coming month was due under the lease on the first of the month and the tenant rejected the lease on the second, "S 365(d)(3) is unambiguous as to the debtor's rent obligation and requires payment of the full month's rent;" proration would be inconsistent with the statute); In re R.H. Macy, 152 B.R. at 873 ("As [the landlord] correctly notes,[the debtor] is not directly liable for the reassessed taxes, but only

_____

4. In re Child World, 161 B.R. 571, 575-77 (S.D.N.Y. 1993), and a line of similar cases focus on Senator Hatch's "current payment" for "current services" language and conclude that S 365(d)(3) was targeted at the specific inequity of requiring the landlord to provide current services without compensation. Senator Hatch's description of the solution chosen by Congress is not so limited, however.

9

contractually obligated to pay such amounts to [the landlord.] Accordingly, the reassessed taxes represent an obligation of [the debtor] under the Lease that arose after the order for relief which must be timely performed in accordance with section 365(d)(3)."); In re Duckwall-Alco Stores, 150 B.R. 965, 976 n.23 (D. Kan. 1993) (stating that "[t]he language of S 365(d)(3) is clear in imposing the duty to comply with all lease obligations arising after the order for relief. . . . The lease did not provide for payment of taxes to the landlord as they accrued."). See also Joshua Fruchter, To Bind or Not to Bind -- Bankruptcy Code S 365(d)(3): Statutory Minefield, 68 Am. Bankr. L.J. 437, 473 (1994).

We reach the conclusion that S 365(d)(3) is unambiguous with some reluctance given that one sister court of appeals and a number of other courts have reached the opposite conclusion and have opted for a proration approach. See, e.g., In re Handy Andy, 144 F.3d 1125 (7th Cir. 1998); In re Child World, 161 B.R. 571 (S.D.N.Y. 1993), reversing 150 B.R. 328 (Bankr. S.D.N.Y. 1993). Nevertheless, we find ourselves unpersuaded by the contentions that have led them to their conclusion. We acknowledge that there are aspects to a proration approach that Congress might have found desirable. It is not our role, however, to make arguably better laws than those fashioned by Congress. See Touche Ross & Co. v. Redington, 442 U.S. 560, 578 (1979). We also acknowledge that proration was the pre-Code practice and that we had been admonished not to"read the Bankruptcy Code to erode past bankruptcy practice absent a clear indication that Congress intended such a departure." Pennsylvania Dept. Pub. Welfare v. Davenport, 495 U.S. 552, 563 (1990). It seems clear to us, however, that Congress enacted S 365(d)(3) for the purpose of altering a pre-Code practice that had created a problem for landlords of non-residential property and that our task is to determine the nature of the change based on the text chosen. Finally, we acknowledge that the result we reach may in some cases leave room for strategic behavior on the part of landlords and tenants. Here, we tender only two observations. Tax reimbursement obligations are only a small constellation in the universe of obligations coming within the scope of S 365(d)(3), and there is no basis in the

text for distinguishing them from rent and numerous other obligations of tenants. Moreover, strategic behavior even in the area of tax reimbursement can be constrained by forethought and careful drafting.

Contrary to the suggestion of Montgomery Ward, we do not find our decision in In re Columbia Gas Transmission Corp., 37 F.3d 982 (3d Cir. 1994), to be helpful in resolving the issue before us. As Montgomery Ward stresses, we there observed that a tax liability is generally"incurred on the date it accrues, not on the date of the assessment or date on which it is payable." Id. at 985. Columbia Gas did not involve a lease, however, and, accordingly, did not call upon us to interpret S 365(d)(3).

III.

Montgomery Ward's lease obligation to reimburse CenterPoint for tax payments arose post-order and prior to rejection. Under S 365(d)(3), Montgomery Ward's obligation must be fulfilled not in part, but in full.

The judgment of the District Court will be reversed and this case will be remanded for proceedings consistent with this opinion.

MANSMANN, Circuit Judge, dissenting:

I.

This appeal requires us to determine when a leasehold obligation "arises" for purposes of S 365(d)(3) of the Bankruptcy Code. The majority holds, in effect, that an obligation that accrues over time does not arise as it accrues, but instead arises at whatever time the parties specify in their lease. Because I believe that the majority's holding gives an unwarranted preference to landlords for recovery of "pre-petition" debts, I respectfully dissent.

II.

Section 365(d)(3) provides, in pertinent part, that:

> The trustee shall timely perform all the obligations of the debtor . . . arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title.

11 U.S.C. S 365(d)(1). The plain import of this provision is that the trustee must fulfill all obligations under the lease which "arise" from the date of the order until the date of assumption or rejection.[1]

In the present case, the lease called for reimbursement of taxes when invoiced by the landlord. Shortly after the

_____

1. I do not perceive a "syntactical ambiguity" in the statute. Unlike the majority, I read the phrase "from and after" as a redundant pair, much like the common phrases "over and above" or"cease and desist". Hence, I believe that "from" is used in the sense of"commencing with", and modifies the order rather than the lease: The statute deals with obligations under the lease, arising "from and after" the date of the order. Although the majority's alteration of the syntax through insertion of commas may resolve the majority's perceived difficulty with the usage of "from", it creates a new usage problem by designating the order for relief (or perhaps the relief itself) to be "under" the lease. In any event,
it appears that these disagreements over the parsing of the statutory text are of merely academic concern, as I believe that the majority agrees that the trustee need not perform obligations that arise before the date of the order.

tenant filed for bankruptcy protection in July, 1997, the landlord issued invoices for taxes attributable to all of 1996 and 1997, up to the September 1, 1997 expiration date of the lease. The majority today holds that, because the billing took place within the eight-week administrative period between entry of an order for relief and expiration of the lease (before assumption or rejection thereof), the entire twenty months' worth of tax obligations "arose" during that eight-week period. In so holding, the majority elevates the accident or artifice of the billing date above the economic reality of the accrual, and thereby inappropriately burdens the administration of the bankrupt estate and unfairly favors landlords over similarly situated pre-petition creditors.

The majority's holding is predicated on its view that the "fundamental tenet" of S 365(d)(3) is that "it is the terms of the lease that determine the obligation and when it arose". Supra at 7. While I agree that the terms of the lease determine the obligation, the statute says nothing about how to determine when the obligation arises. Nothing in the text is inconsistent with the common-sense view that when an obligation arises may be fixed by its intrinsic nature and/or by the extrinsic circumstances of its accrual. An obligation attributable to a particular time may well be said to "arise" at that time, and an obligation that accrues over time may be said to "arise" as it accrues, without doing violence to the statutory language.

I believe that the true "fundamental tenet" of S 365(d)(3) is that landlords, like other post-petition creditors, should receive full and timely payment for post-petition services. This is in keeping with the policy of the Bankruptcy Code of giving priority to post-petition claims to enable the debtor to keep operating for as long as its current revenues cover current costs (so that the debtor's business is yielding a net economic benefit). See In re Handy Andy Home Improvement Centers, Inc., 144 F.3d 1125, 1127 (7th Cir. 1998). Moreover, S 365(d)(3) should be read in light of the overarching policy of treating all creditors within a class (such as unsecured pre-petition trade creditors) alike. Both of these policies are disserved by requiring the debtor or trustee to repay back taxes, a pre-petition "sunk cost", as a condition of ongoing operations. See id. at 1128.

13

Our decision today creates a split of authority among the Courts of Appeals concerning priority of back taxes that are billed post-petition, as it is squarely in conflict with the Seventh Circuit's well-reasoned decision in Handy Andy. As Chief Judge Posner explained:

> The quarrel between the parties is over whether [tenant]'s "obligation" under the lease could arise before [tenant] was contractually obligated to reimburse [landlord] for the taxes that the latter had paid. . . . [the] `billing date' approach is a possible reading of section 365(d)(3), but it is neither inevitable nor sensible. It is true that [tenant]'s obligation to [landlord] to pay (or reimburse [landlord] for paying) the real estate taxes did not crystallize until the rental due date after the taxes were paid. But since death and taxes are inevitable and [tenant]'s obligation under the lease to pay the taxes was clear, that obligation could realistically be said to have arisen piecemeal every day of 1994 and to have become fixed irrevocably when, the last day of the year having come and gone, the lease was still in force. Had the lease been terminated for one reason or another on January 1, 1995, [tenant] would have had a definite obligation to reimburse [landlord] for the 1994 real estate taxes when those taxes were billed to [landlord]. The obligation thus arose, in a perfectly good sense, before the bankruptcy. The obligation to reimburse [landlord] for the first installment of the 1995 taxes likewise arose before the bankruptcy.

Handy Andy, 144 F.3d at 1127. I find this reasoning persuasive, and I would follow it in this case.

The majority finds support for its position in a recent decision by the Sixth Circuit that involved just one month of advance rent rather than a year and a half of back taxes. See In re Koenig Sporting Goods, Inc., 203 F.3d 986 (6th Cir. 2000). Although I disagree with the statutory analysis in Koenig Sporting Goods, it would seem that parceling a continuing obligation into monthly increments is far less subversive of statutory policies than aggregating a year or more of accrued debt for priority purposes. In any event, the Sixth Circuit itself apparently considers the difference

14

between a short advance payment and a long back payment to be important. Compare Vause v. Capital Poly Bag, Inc., 886 F.2d 794 (6th Cir. 1989) (rejecting argument that farm rent payable at end of year accrued only on the payment date) with Koening Sporting Goods, 203 F.3d at 990 nn.4&5 (distinguishing Vause as involving rent payments in arrears rather than in advance).

Although some courts have applied the "billing date" approach adopted by the majority today, most decisions have rejected that approach in favor of proration. See, e.g., In re McCrory Corp., 210 B.R. 934, 940 (S.D.N.Y. 1997) (observing that the billing date approach "would result in a windfall either to the landlord or the debtor-tenant"); In re Victory Markets, Inc., 196 B.R. 6 (Bankr. N.D.N.Y. 1996); In re All For A Dollar, Inc., 174 B.R. 358 (Bankr. D. Mass. 1994); In re Child World, Inc., 161 B.R. 571 (S.D.N.Y. 1993) (observing that allowing landlords to recover for pre-petition services billed post-petition "would grant landlords a windfall payment, to the detriment of other creditors"); In re Ames Department Stores, 150 B.R. 107 (Bankr. S.D.N.Y. 1993). Cf. Daugherty v. Kenerco Leasing Co. (In re Swanton Corp.), 584 B.R. 474 (S.D.N.Y. 1986) (rent prorated although lease called for yearly rental payments). 2

The proration approach is in keeping with what had been, prior to enactment of S 365(d)(3), the well-established rule. See, e.g., Child World, 161 B.R. at 575-76 (referring to "the long-standing practice under S 503(b)(1) of prorating debtor-tenant's rent to cover only the postpetition, prerejection period, regardless of billing date"). As the majority acknowledges, we should not read legislation to alter established bankruptcy practice "absent a clear indication that Congress intended such a departure." Supra at 10, quoting Pennsylvania Dept. Pub. Welfare v. Davenport, 495 U.S. 552, 563 (1990). See also Cohen v. De La Cruz, 523 U.S. 213 (1998) (same); Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Protection, 474 U.S. 494, 501

_____

2. See generally 2 Norton Bank. L. & Prac. 2d S 42:8 Nonresidental Real Property Leases under Code S 365(D)(3) (2000 Supp.); Arnold M. Quittner, Executory Contracts and Leases, 805 PLI/Comm 79, 249-53 (April 2000).

15

(1986) ("The normal rule of statutory construction is that if Congress intends for legislation to change the interpretation of a judicially created concept, it makes the intent specific. The court has followed this rule with particular care in construing the scope of bankruptcy codifications.").

Although, as the majority suggests, Congress clearly intended to change prior practice when it enacted S 365(d)(3), I can find no indication of a specific intent to displace proration with the billing date approach. Rather, it seems clear that the statute was aimed at providing landlords with current pay for current services and relieving them from the "actual and necessary" analysis required under S 503(b)(1). Nothing in the text or legislative history suggests that Congress wished to go beyond putting landlords on the same footing with other trade creditors by allowing them through the timing of their billing to transform pre-petition claims into post-petition claims. See Handy Andy, 144 F.3d at 1128; Child World  at 575-76.

The majority seeks to marshal support for its interpretation from the remarks of Senator Hatch in the legislative history. However, the Senator's observation that the trustee must perform "all the obligations . .. at the time required in the lease" simply has no bearing on the question before us. The quoted passage merely indicates when an obligation must be performed: "at the time required in the lease", which adds nothing to the statute's requirement of "timely" performance. It simply does not address how to determine when the obligation arises.

III.

Because neither the language of the statute nor the legislative history forecloses the District Court's common-sense interpretation – one that preserves prior practice and better serves fundamental bankruptcy policies, I would affirm the decision below. Accordingly, I dissent.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

16