In re **MONTGOMERY WARD HOLDING CORP., a Delaware corporation, et al., Debtors.**

**No. 97–1409 PJW.**

United States Bankruptcy Court, D. Delaware.

Feb. 23, 2004.

William F. Taylor, Jr., McCarter & English LLP, Wilmington, DE, J. Mark Fisher, Jason M. Torf, Schiff, Hardin & Waite, Chicago, IL, for CenterPoint Properties Trust.

Daniel J. DeFranceschi, Michael Merchant, Richards, Layton & Finger, Wilmington, DE, Shawn J. Organ, Kelley M. Griesmer, Jones, Day, Reavis & Pogue, Columbus, OH, for MW Distribution Trust.

## MEMORANDUM OPINION

PETER J. WALSH, Bankruptcy Judge.

Pending before the Court is the motion (Doc. # 6705) and the supplemental motion (Doc. # 6727) of CenterPoint Properties Trust ("CenterPoint") to compel payment of an administrative claim. For the reasons set forth below, the motions will be denied.

## BACKGROUND

On September 7, 1995, Montgomery Ward Holding Corp. ("Montgomery Ward") and CenterPoint executed a lease agreement with respect to commercial property owned by CenterPoint and located in Franklin Park, Illinois. The lease term was to expire on September 1, 1997. Pursuant to the terms of the lease, Montgomery Ward was to reimburse CenterPoint for real estate taxes assessed on the property. Pursuant to the terms of the lease, that tax obligation constitutes "additional rent".

On July 7, 1997 (the "Petition Date"), Montgomery Ward and affiliated entities (Montgomery Ward and the affiliates collectively "the Debtors") filed voluntary petitions under Chapter 11 of the Bankruptcy Code.[1] Montgomery Ward continued to make use of the premises as a debtor-in-possession pursuant to §§ 1107 and 1108, but neither assumed nor rejected the lease prior to its expiration.

On July 11, 1997, CenterPoint sent three invoices to Montgomery Ward aggregating $1,049,202.37, representing real estate tax obligations on the subject property. Montgomery Ward did not remit full payment, but did remit $96,584.95 as payment on the third invoice. That amount repre-

---

1. Sections of the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*, are hereinafter referred to as "§ _____."

sented the pro-rated portion of the taxes attributable to the period subsequent to the Petition Date. Montgomery Ward's position was that all taxes attributable to the pre-petition period constituted pre-petition non-priority unsecured claims.

On September 15, 1997, CenterPoint filed a motion pursuant to § 365(d)(3) [2] seeking payment in full of Montgomery Ward's tax reimbursement obligation. CenterPoint argued that all invoices were payable immediately as "obligations of the debtor ... arising from ... the lease." Montgomery Ward argued that Third Circuit jurisprudence required that it pay only the portion of the taxes attributable to the post-petition period.

This Court denied CenterPoint's § 365(d)(3) motion on April 6, 1998. The effect of that ruling was to treat the remaining obligation as a pre-petition unsecured claim. CenterPoint appealed that decision to the District Court, which affirmed on November 15, 1999. An appeal was taken to the Third Circuit Court of Appeals, where CenterPoint prevailed on October 10, 2001. The Third Circuit agreed with CenterPoint that "an obligation arises under a lease for the purposes of § 365(d)(3) when the legally enforceable duty to perform arises under that lease." *CenterPoint Props. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 268 F.3d 205, 211 (3d Cir.2001). The Third Circuit rejected the proration approach and concluded that, as the tax reimbursements came due under the lease post-petition and at a time when the lease had not expired or been rejected, "Montgomery Ward's obligation must be fulfilled not in part, but in full." *Id.* at 211–12. Thus, the effect of that ruling was to treat the obligation as an administrative claim.

While CenterPoint's appeals were pending, however, other events relevant to the motions were occurring. On July 15, 1999, the Debtors' joint plan of reorganization (the "Plan") was confirmed and became effective on August 2, 1999. Pursuant to the Plan certain of the Debtors' assets and liabilities were transferred to the Reorganized Debtors and other assets (essentially the business assets) and liabilities were transferred to a new entity, Montgomery Ward, LLC, which was created pursuant to the terms of the Plan. That entity is referred to in the Plan as "New Retailer". Pursuant to the Plan and the confirmation order, on April 6, 2000, this Court entered a final order allowing professional fees and expenses (the "Final Fee Order").

On December 28, 2000, New Retailer filed a voluntary Chapter 11 petition in this Court identified as Case No. 00–4667(RTL). (Hereinafter, the case before me, Case No. 97–1409(PJW), will be referred to as "Ward I" and Case No. 00–4667(RTL) will be referred to as "Ward II".) Ward II is a liquidating chapter 11 case. CenterPoint filed a proof of claim in Ward II on June 29, 2001 and filed the two subject motions (Doc.## 6705 and 6727) in Ward I on January 3, 2002 and March 14, 2002, respectively. The Reorganized Debtors have filed oppositions to both motions.

By its motions, CenterPoint argues that by reason of § 1129(a)(9)(A) and the terms of the Plan its administrative claim must be paid in full by Montgomery Ward in

---

**2.** In relevant part, § 365(d)(3) provides:

The trustee shall timely perform all the obligations of the debtor, except those specified in section 365(b)(2), arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title.

11 U.S.C. § 365(d)(3)(2003).

Ward I.[3] Alternatively, CenterPoint argues that its claim should be paid from specified funds set aside by Montgomery Ward pursuant to the Plan for the payment of certain unsecured claims. As a second alternative, CenterPoint argues that professionals who were paid administrative claims aggregating in excess of $34 million in Ward I should be required to disgorge a portion of their compensation so as to satisfy CenterPoint's entitlement to ratable treatment.

## DISCUSSION

■ It seems clear from relevant Plan provisions that CenterPoint has an administrative claim. In relevant part, Plan section 1.01 defines an administrative claim as follows:

Administrative Claim means a Claim for costs and expenses of administration of the Reorganization Cases Allowed under section 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code, including: (a) any actual and necessary costs and expenses incurred after the Petition Date of preserving the Debtors' estates and operating the businesses of the Debtors (*such as* wages, salaries, commissions for services, and *payments for* inventories, *leased equipment, and premises*), and Claims of governmental units for taxes . . .;(b) compensation for legal, financial, advisory, accounting, and other services and reimbursement of expenses Allowed by the Bankruptcy Court under section 330, 331 or 503(b) of the Bankruptcy Code to the extent incurred prior to the Effective Date . . . . (emphasis added)

Plan section 2.01 addresses the treatment of administrative claims and in relevant part that section provides that "each holder of an Allowed Administrative Claim will receive, in full satisfaction of its Claim, Cash in an amount equal to such Administrative Claim on the later of the Effective Date and the date such Administrative Claim becomes an Allowed Administrative Claim, or as soon thereafter as is practicable."

Applying these provisions to the facts and the law here, CenterPoint has an administrative claim which occurred post petition on July 11, 1997 when it tendered the tax reimbursement invoices to Montgomery Ward. That claim became an allowed administrative claim in October of 2001 when the Third Circuit's order became final and nonappealable.

CenterPoint's first argument is easily addressed by reference to specific and unambiguous Plan provisions.

Plan section 5.01(4) provides:

In exchange for the New LLC interests, *Reorganized Montgomery Ward shall* issue the New Ward Note and shall *transfer to New Retailer all right, title and interest in all of the assets of Reorganized Montgomery Ward,* including existing licenses and permits, other than (i) the Retained Assets, (ii) the stock of Signature, and (iii) any Retail Subsidiaries identified by GE Capital not to be so contributed. *Such assets shall be transferred to New Retailer subject to, and New Retailer shall assume sole and ex-*

---

**3.** Section 1129(a)(9)(A) provides that

(a) The court shall confirm a plan only if all of the following requirements are met:

\*     \*     \*     \*     \*     \*

(9) Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that—

(A) with respect to a claim of a kind specified in section 507(a)(1) or 507(a)(2) of this title, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim.

11 U.S.C. § 1129(a)(9)(A).

*clusive responsibility for: (a) all claims, liabilities and obligations of the Debtors incurred after the Petition Date (including, without limitation, claims, liabilities and obligations incurred pursuant to the Plan),* other than any claims, liabilities and obligations directly relating to the Retained Assets, the New Loss Sharing Note, the GE Capital Deposit Claim and the New Ward Note, (b) any tax liabilities of the Debtors for periods ending on or before the Effective Date to the extent payable after the Effective Date (whether or not relating to the transferred assets), including, without limitation, any taxes incurred in connection with the transfer of assets, and (c) any tax liabilities relating to the sale of Signature and the Pension Plan Restructuring Event, provided that such sale or event occurs on or before January 1, 2000. (emphasis added)

Plan section 10.04 provides:

> Except as otherwise provided in the Plan, the property of the Debtors' estates shall (i) revest in the Reorganized Debtors on the Effective Date, and (ii) be revested free and clear of all liens, security interests, Claims and Interests of holders of Claims and Interests and all such liens, security interests, Claims and Interests shall be extinguished.

As an allowed administrative claim, CenterPoint is entitled to payment of the entire amount invoiced for the real estate taxes because the entire amount constitutes an obligation of Montgomery Ward incurred after the Petition Date. However, pursuant to Plan section 10.04 the Reorganized Debtors' property was revested free and clear of all such claims and pursuant to Plan section 5.01(4) the sole and exclusive responsibility for such claims was

transferred to New Retailer, the debtor in Ward II.

In its second argument, CenterPoint asserts it is entitled to be paid from what appears to be one of Montgomery Ward's only two remaining assets: a reserve fund set aside to pay Class 3 unsecured claimants.[4] Until the Third Circuit ruled otherwise, Montgomery Ward viewed CenterPoint as having a pre-petition unsecured claim. Consequently, CenterPoint asserts that it "always held *at least* a MW Class 3 Unsecured Claim." (Doc. # 6727 at 11). Class 3 unsecured claims consist of MW claims and Lechmere claims. MW Class 3 claims are defined in the Plan as: "any unsecured, non-priority Claim against the Consolidating Debtors (including Bank Claims and any GE Capital Trade Claim against Montgomery Ward) *that is not an Administrative Claim* . . . ." Plan section 1.86 (emphasis added). Likewise, the definition of a Lechmere Class 3 claim excludes administrative claims. *See* Plan section 1.80 (defining Lechmere Class 3 claim as "any unsecured, non-priority Claim against Lechmere (including any GE Capital Trade Claim against Lechmere), *that is not* a Lechmere Bank Guaranty Claim, Lechmere Noteholder Guaranty Claim, *Administrative Claim* . . . .)" (emphasis added).

The "Disputed Class 3 Unsecured Claims Reserve" is defined in Plan section 1.42 as:

> the reserve of Cash established for the holders of Disputed Class 3 Unsecured Claims, which reserve shall be held in trust for holders of Allowed Class 3 Unsecured Claims and will not (a) constitute property of any of the Reorganized Debtors or their respective estates, or (b) be subject to claims, liens,

---

4. What appears to be Montgomery Ward's only other asset is a reserve fund that was established to pay disputed Class 6 Claims.

However, CenterPoint does not assert any entitlement to be paid from the funds in the Class 6 reserve fund.

or interests of, by or through any of the Reorganized Debtors or their respective estates.

By the terms of Plan section 5.04, only Allowed Class 3 Unsecured Claims have access to the reserved funds:

Pursuant to the Escrow Agreement and the Escrow Order, on the Effective Date (or as soon as practicable thereafter in accordance with the terms of the Escrow Agreement), the Escrow Agent shall transfer the Class 3 Deposit, free and clear of liens of GE Capital, to the Disbursing Agent for the benefit of holders of Allowed Class 3 Unsecured Claims. The Class 3 Deposit and MW Class 3 Distribution Pool shall not constitute property of the Debtors' estates or the property of the Reorganized Debtors .... *Holders of Allowed Claims (other than Allowed Class 3 Unsecured Claims) and Interests ... shall have no recourse to the MW Class 3 Distribution Pool or the proceeds thereof.*" (emphasis added)

Thus, the Plan makes clear that administrative claims are not Class 3 unsecured claims and that the monies in the Class 3 reserve fund cannot be used to pay administrative claims. The Plan also states that no creditor with an allowed claim that is not a Class 3 claim shall have recourse to the Class 3 reserve fund. As a result, by definition, CenterPoint's claim cannot be treated as a Class 3 claim or have any rights in the Class 3 reserve fund.

It does not make any difference how Montgomery Ward viewed CenterPoint's claim prior to the Third Circuit's decision. The claim was disputed, with CenterPoint asserting that it was an administrative claim and Montgomery Ward asserting that it was a general unsecured claim. It was not paid because it was not an allowed claim. When that dispute was resolved by the Third Circuit, it became an allowed claim and its classification and treatment are determined by the unambiguous directives of Plan sections 1.01 and 2.01. Of course, according to Plan section 5.01(4), its source of payment is New Retailer.

As its second alternative, CenterPoint urges this Court to order the disgorgement of the fees paid to certain other administrative creditors in Ward I so as to generate funds to pay CenterPoint's allowed administrative claim. Recognizing that the number of administrative creditors runs into the thousands and includes a large number of trade creditors and landlords paid in the ordinary course of business, CenterPoint asserts it would be most practical and appropriate to order disgorgement only from the professionals paid in accordance with the Plan and Final Fee Order. Of course, as noted above, Plan section 1.01 includes the professional fees in the definition of administrative claims. There are significant statutory and case law obstacles to granting the relief requested by CenterPoint.

█ Once a plan is confirmed, a creditor's rights are governed exclusively by the terms of that plan.

Except as provided in subsections (d)(2) and (d)(3) of this section, *the provisions of a confirmed plan bind the debtor,* any entity issuing securities under the plan, any entity acquiring property under the plan, *and any creditor,* equity security holder, or general partner in the debtor, whether or not the claim or interest of such creditor, equity security holder, or general partner is impaired under the plan and whether or not such creditor, equity security holder, or general partner has accepted the plan.

11 U.S.C. § 1141(a) (emphasis added).

The Bankruptcy Code extinguishes any debt that predates the plan:

Except as otherwise provided in this subsection, in the plan, or in the order confirming the plan, the confirmation of a plan-

> (A) discharges the debtor from any debt that arose before the date of such confirmation . . . .

11 U.S.C. § 1141(d)(1)(A).

■ Section 1141(a) of the Code provides that the plan becomes a legally binding agreement. Thus, "once the reorganization plan is approved by the bankruptcy court, each claimant gets a 'new' claim, based upon whatever treatment is accorded to it in the plan itself." *In re Benjamin Coal Co.*, 978 F.2d 823, 827 (3d Cir. 1992). *See also In re Pettibone Corp.*, 134 B.R. 349, 351–52 (Bankr.N.D.Ill.1991) ("A plan of reorganization is a contract which binds a debtor and its creditors."); *Fed. Land Bank of Jackson Miss. v. Herron (In re Herron)*, 60 B.R. 82, 84 (Bankr. W.D.La.1986)("Once a plan is confirmed, the preconfirmation debt is 'replaced' with a new indebtedness as provided in the confirmed plan. The new indebtedness is in essence a new and binding contract between the debtor and the creditors."); *In re Ernst*, 45 B.R. 700, 702 (Bankr.D.Minn. 1985)("The plan is essentially a new and binding contract, sanctioned by the Court, between the debtor and his preconfirmation creditors.")

The professionals have been paid in accordance with the Plan terms. To grant the relief requested by CenterPoint would effectively require an amendment to the Plan as it relates to the treatment of the professionals. Instead of being paid in full as called for by the Plan/contract, the professionals would be paid something less. CenterPoint cites no authority for the Court to effect such an amendment. Of course, New Retailer is in breach of the Plan/contract as it relates to CenterPoint and that breach presumably will be addressed in Ward II.[5]

■ CenterPoint argues that Ward I is administratively insolvent and cites numerous cases for the proposition that a bankruptcy court can, in its discretion, order disgorgement so that all administrative claimants are treated ratably. I have two problems with this argument. First, Ward I is not administratively insolvent because it is not an estate in administration. Pursuant to the Plan, estate assets were transferred either to New Retailer or to the Reorganized Debtors. Once a plan has been confirmed, "in the absence of any contrary provisions in a plan title to property revests in the debtor along with normal ownership rights." *Kepler v. Independence Bank of Madison (In re Ford)*, 61 B.R. 913, 917 (Bankr.W.D.Wis.1986) (citations omitted). And " 'upon confirmation of a plan of reorganization, property of the bankruptcy estate vests in the reorganized debtor . . . and the administration of the estate ceases.' " *In re W.R.M.J. Johnson Fruit Farm, Inc.*, 107 B.R. 18, 19 (Bankr. W.D.N.Y.1989) (citations omitted).

Second, all of the cases cited by CenterPoint in which the bankruptcy court ordered disgorgement involved administratively insolvent estates. In *Guinee v. Toombs (In re Kearing)*, 170 B.R. 1, 8 (Bankr.D.D.C.1994), a case relied upon by CenterPoint, the court in directing disgorgement of interim attorneys fees, distinguished the matter before it from the situation where courts denied relief by way of disgorgement where the funds had been disbursed pursuant to a confirmed plan. *See, e.g., In re Kaleidoscope of High Point,*

---

**5.** I express no view as to what treatment should be accorded to CenterPoint's claim in Ward II.

*Inc.,* 56 B.R. 562 (Bankr.M.D.N.C.1986)(denying the request of unpaid professionals for disgorgement from paid professionals because the funds were disbursed pursuant to a confirmed plan); *Still v. Rossville Bank (In re Chattanooga Wholesale Antiques, Inc.),* 67 B.R. 899 (Bankr.E.D.Tenn.1986)(finding the trustee could not recover payments made to a bank pursuant to a confirmed plan which erroneously treated the banks' claim as secured).

Montgomery Ward also makes arguments that the doctrines of judicial estoppel, judicial mootness, and equitable mootness bar CenterPoint's claim. I do not believe there is any need to address those arguments as I find the terms of the Plan preclude CenterPoint from obtaining recovery in Ward I. Nevertheless, I note that at no time did CenterPoint object to any provision of the Plan, the Plan confirmation, or the Final Fee Order and the resultant disbursements to administrative professionals. CenterPoint now argues that Montgomery Ward "should have created a reserve for the contingency that CenterPoint would prevail on appeal and become entitled to an Administrative Claim." (Doc. # 6727 at 7) Of course, the Plan contains no such requirement and at no point prior to the subject motions did CenterPoint suggest that the creation of such a reserve would be appropriate or necessary.

## CONCLUSION

For the foregoing reasons, the motions for the payment of an administrative claim are denied.

## ORDER

For the reasons set forth in the Court's Memorandum Opinion of this date, the motion (Doc. # 6705) and the supplemental motion (Doc. # 6727) of CenterPoint Properties Trust to compel payment of an administrative claim are DENIED.