

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-15-2007

# In Re: Fed Mogul

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-2423

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"In Re: Fed Mogul " (2007). *2007 Decisions.* Paper 1471.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/1471

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 05-2423

IN RE: FEDERAL-MOGUL GLOBAL INC.;
T & N LIMITED, Debtors

COMPUTER SALES INTERNATIONAL,
INC.,

Appellant

Appeal from the United States District Court
for the District of Delaware
(D.C. Civil Action No. 03-cv-00346)
District Judge: Honorable Joseph H. Rodriguez

Argued November 28, 2006

Before: RENDELL and AMBRO, <u>Circuit Judges</u>
PRATTER,[*] <u>District Judge</u>

(Opinion filed March 15, 2007)

William F. Taylor, Jr. Esquire (Argued)
McCarter & English
919 North Market Street
P.O. Box 111
Wilmington, DE   19899

Counsel for Appellant

---

[*]Honorable Gene E.K. Pratter, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

Melville W. Washburn, Esquire (Argued)
Sidley Austin
One South Dearborn Street
Chicago, IL   60603

Laura D. Jones, Esquire
James E. O'Neill, Esquire
Pachulski, Stang, Ziehl, Young, Jones & Weintraub
919 North Market Street
P.O. Box 8705, 17th Floor
Wilmington, DE   19801

        Counsel for Appellees

---

OPINION

---

AMBRO, <u>Circuit Judge</u>

We consider whether the Bankruptcy Court properly modified an equipment lease under 11 U.S.C. § 365(d)(5)[1] of the Bankruptcy Code by permitting proration of payment obligations as of the date of rejection of the leases.  For the reasons that follow, we reverse.

I.

In October 2001, Federal-Mogul Corporation, a large automobile parts supplier, and 156 of its U.S. and U.K. subsidiaries (collectively, "Federal-Mogul" or the "Debtors") filed for relief under Chapter 11 of the Bankruptcy Code.  Since then, the

---

[1] At the time of the Bankruptcy and District Courts' opinions, the relevant section was codified at 11 U.S.C. § 365(d)(10).  Throughout this opinion, we refer to it at its current location in the Code, § 365(d)(5).

2

Debtors have continued to operate as debtors in possession.

Computer Sales International ("CSI") is a lessor of computer equipment. Its customers purchase the equipment that they want from other vendors, and then they and CSI execute a sale (to CSI) and lease-back (to the customers). In 1992, CSI and Federal-Mogul entered into a Master Lease Agreement that set out the basic terms of all future equipment leasing transactions. Between 1992 and 2001, Federal-Mogul leased hundreds of pieces of equipment from CSI under some 70 leasing schedules. The Master Lease Agreement provided for monthly rental payments, due in advance on the first day of each month.

In 2002, Federal-Mogul, as debtor in possession, negotiated a new computer leasing arrangement with IBM. Consequently, Federal-Mogul requested the Bankruptcy Court to allow it to approve the new leases and reject the CSI leases. Federal-Mogul planned to replace over 4,200 pieces of equipment in 60 locations; because the process would take a few months, it intended to minimize its costs by rejecting the leases in piecemeal fashion as each individual item was replaced. CSI and other computer lessors unsuccessfully opposed the motion. The Bankruptcy Court held a hearing and granted permission to reject the CSI leases, "with such rejection taking effect upon the Debtors giving notice to the applicable Computer Equipment Lessor" (the "2002 Order").

Upon obtaining court approval, Federal-Mogul began replacing the leases. When it rejected a lease mid-month, it did not pay on the first of that month; rather, sometime later it remitted a prorated payment to reflect the portion of the month up to the date of

3

rejection. CSI objected and demanded payment for the entire month in which the lease was rejected, arguing that the terms of the Master Lease Agreement still controlled and that the entire monthly payment was due on the first of the month.

Because the parties were unable to resolve this dispute between themselves, CSI moved in the Bankruptcy Court to compel payment. The Bankruptcy Court held a hearing in January 2003 and issued an Order (the "2003 Order") denying the motion on two grounds: (1) the terms of the 2002 Order allowing rejection stipulated that rent would be prorated, and CSI waived any argument by not objecting to or appealing that Order; and (2) equity supported modifying the terms of the Master Lease Agreement to allow proration.

The District Court affirmed on substantially similar grounds, and this appeal followed.[2]

## II.

Both the Bankruptcy and District Courts held that CSI waived any argument against proration by not raising the issue before the Bankruptcy Court when Federal-Mogul moved for permission to reject the CSI leases or by not appealing the 2002 Order. The District Court found that proration was implicit both in the motion to reject and in the Bankruptcy Judge's Order, even if not explicitly stated in either, and that CSI's motion was, therefore, untimely. *Computer Sales Int'l, Inc. v. Federal-Mogul Global, Inc. (In re*

---

[2] We have jurisdiction to review a district court's resolution of an appeal of a final order of a bankruptcy court under 28 U.S.C. §§ 158(d)(1) & 1291.

*Federal-Mogul Global, Inc.*), 331 B.R. 160, 166 (D. Del. 2005).

At issue here is whether the 2002 Order allowing rejection of the leases—which was a final order appealable to the District Court under 28 U.S.C. § 158(a)(1)—also decided the issue of proration. If it did, then the issue was decided in a final order that could only be attacked through appeal, a motion to amend, or a motion for relief from judgment. *See* 28 U.S.C. § 158(a)(1) (providing for appeal to the district court); Fed. R. Civ. P. 59 & 60 (providing procedure for moving to amend a final order and moving for relief therefrom, respectively); Fed. R. Bankr. P. 9023 & 9024 (adopting Fed. R. Civ. P. 59 & 60, respectively, into bankruptcy procedure). It is undisputed that CSI did none of those things. On the other hand, if, in approving the rejection, the issue was not decided, then the Bankruptcy and District Courts erred in concluding that it had been resolved in the 2002 Order, and CSI had not waived the right to object to proration.

In a paragraph of Federal-Mogul's motion to reject the leases, entitled "Relief Requested," it requested permission to "reject" a number of leases "pursuant to section 365(a)" of the Bankruptcy Code. Nowhere in that paragraph did Federal-Mogul reference proration, nor did it seek modification of its lease obligations under § 365(d)(5)[3] with

---

[3] Section 365(d)(5), discussed more fully below, requires a debtor to perform all of its obligations under a lease of personal property until that lease is assumed or rejected. It permits a court, however, to modify the obligations of the debtor after notice and a hearing based on the "equities of the case."

respect to the timing or amount of monthly lease payments.[4]

The Bankruptcy Court's Judgment Entry for the 2002 Order states that "the Debtors are authorized to reject each of the Rejected Master Lease Schedules pursuant to 11 U.S.C. § 365(a)[,] with such rejection taking effect upon the Debtors giving notice to the applicable Computer Equipment Lessor . . . that all of the equipment subject to a Rejected Master Lease Schedule has been replaced and either is available for shipment or has been lost or disposed." Upon CSI's later challenge to the Debtors' prorated payments, the Bankruptcy Judge in 2003 nevertheless found the right to prorate implicit (or, perhaps, explicit) in the 2002 Order: "[T]he order rejecting the lease[s] says that they're rejected the date we tell you they're rejected, and the order, the motion specifically said that means you get paid up to that date." J.A. at 133.

The District Court agreed with the Bankruptcy Court's interpretation of the motion. It referenced that the "Debtors will cease paying rent on an administrative basis for the equipment" language, and stated:

---

[4] In a section entitled "The Rejection of the Rejected Master Lease Schedules," Federal-Mogul sought "to have the rejections effective as of the date that the Debtors and IBM return or make available to the Computer Equipment Lessors the equipment being replaced." The motion also states that "[o]nce the Debtors either ship or make the equipment . . . available to the applicable Computer Equipment Lessor[,] . . . the Debtors . . . will inform [them] that the particular schedule has been rejected as of that date, and the Debtors will cease paying rent on an administrative basis for the equipment." Similarly, in its prayer for relief Federal-Mogul asked the Court to "authoriz[e] rejection of the Rejected Master Lease Schedules effective on the date that the Debtors notify the applicable Computer Equipment Lessor that all of the equipment contained on the Master Lease Schedule has been replaced."

6

Thus, CSI was sufficiently notified of Debtors' desire to cease paying rent of [*sic*] the day the lease was rejected. Undeniably, the Master Lease required that Debtors make payment on the first of every month. Yet, CSI cannot idly stand-by when the Debtors make a request for an amendment to those terms in a motion to reject its lease. The payment terms and rejection process were the [rejection motion's] *raison d'etre*. In addition, CSI's failure to object to any aspect of this procedure is especially pronounced given the Bankruptcy Court's mandate to consider equity in CSI's Motion for Payment pursuant to 11 U.S.C. § 365(d)[(5)].

*In re Federal-Mogul*, 331 B.R. at 166.

Section 365(d)(5) of the Bankruptcy Code states: "The trustee shall timely perform all the [lease] obligations of the debtor . . . unless the court, after notice and a hearing and based on the equities of the case, orders otherwise with respect to the obligations or timely performance thereof." This gives bankruptcy courts the power to modify debtors' lease obligations after notice and a hearing. It is not the same as the § 365(a) power to approve the debtor's acceptance or rejection of unexpired leases, for, unlike § 365(d)(5), § 365(a) does not give bankruptcy courts the power to *amend* lease obligations. *Cf. In re Univ. Med. Ctr.*, 973 F.2d 1065, 1075 (3d. Cir. 1992) ("Assumption of the executory contract requires the debtor to accept its burdens as well as permitting the debtor to profit from its benefits."). To amend, a debtor must move under § 365(d)(5) and give notice to the adverse party; the court must hear the issue, and it must affirmatively order the modification.

In this context, do references to rejections of leases as of a certain date mean that the leases were amended such that the contracted-for lease payments were to be prorated as of that date? We think not. Under *In re Montgomery Ward*, when a lease of real

7

property is rejected under § 365(d)(3), all sums due pre-rejection under the terms of that lease are owing irrespective of whether the sums otherwise can be prorated. *Centerpoint Properties v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 268 F.3d 205, 209 (3d Cir. 2001). Put another way, proration of sums owing pre-rejection can only be affected by modifying the lease to the extent the Bankruptcy Code permits. *See id.*

Against this background, we do not conclude that mere rejections of equipment leases alter the obligation to pay the entire amount that came due on the first of the month preceeding the rejections. Neither Federal-Mogul's motion nor the Bankruptcy Court's 2002 Order referenced § 365(d)(5);[5] rather, the only relevant Code section referenced was § 365(a), which (as noted) does not provide for the modification of lease obligations. Moreover, given that modification requires "notice and a hearing" in which the Court considers the equities involved, one would expect to see some discussion of those equities in Federal-Mogul's motion or in the hearing transcript. As the Bankruptcy Court conceded, however, the subject did not come up. J.A. at 133 (statement of Newsome, B.J.) ("[N]ot one sentence was argued about [the equities of proration].").

Thus, under § 365(d)(5) it was Federal-Mogul's obligation to move the Bankruptcy Court to allow it to modify its lease obligations and to stipulate what

---

[5] We decline to decide that the vague phrase "Debtors will cease paying rent on an administrative basis" in the Debtors' motion meant that the contractual payment that should have been paid on the first of the month was somehow retroactively altered.

modifications it desired. Apparently Federal-Mogul desired, and the Court thought it ordered, a modification to the lease that is not apparent on the face of the 2002 Order, Federal-Mogul's motion seeking that Order, or the transcript of the 2002 hearing. Under these circumstances, construing the Bankruptcy Court's order to deprive CSI of the ability to litigate the issue of modification would play at cross-purposes with the burden-shifting scheme that Congress has enacted.

We recognize that "[w]e must give particular deference to the district court's interpretation of its own order." *In re Fine Paper Antitrust Litig.*, 695 F.2d 494, 498 (3d Cir. 1982); *see also WRS, Inc. v. Plaza Entm't, Inc.*, 402 F.3d 424, 428 (3d Cir. 2005) (stating that "great deference is given to a district court's interpretation of its own order"); *Pittsburgh Terminal Corp. v. Balt. & Ohio R.R. Co.*, 824 F.2d 249, 254 (3d Cir. 1987) (quoting *Fine Paper*). We will not, however, give effect to an interpretation that is not apparent from the text, particularly when doing so burdens a party's substantive rights. *See DirecTV v. Leto*, 467 F.3d 842, 847 (3d Cir. 2006).

Therefore, we hold that the Bankruptcy Court erred in construing its order as having provided for proration of payments due under the Master Lease Agreement. At a minimum, debtors should make their requests to modify lease obligations explicit by invoking the Court's § 365(d)(5) authority and noting the equities that support modification. Similarly, they should not conflate the § 365(a) power to assume or reject with the § 365(d)(5) power to modify, as those powers are distinct.

9

Though both the Bankruptcy and District Courts believed that proration was permitted as part of the 2002 Order, both proceeded to rule in the alternative. The Bankruptcy Court concluded that the "equities of the case" supported modifying the leases, and the District Court affirmed, thus permitting payments to be modified even if that was not clear from the 2002 Order.

In its 2003 Order, the Bankruptcy Court explained its reasons for allowing modification as follows:

> Given the ample notice afforded the lessor that these leases would be rejected, the court find[s] it would be inequitable to allow the lessor [a] windfall by burdening the debtor's estate of rent for the entire month on equipment the debtor used only for a portion thereof.

J.A. at 137. In affirming, the District Court stated:

> Despite the existence of a bargained-for lease, equity could sustain a decision to prorate the rents because the Debtor no longer had possession of the property. The rehabilitative purposes of the Code would also be served by allowing a proration of the rents in this case because more money would be available for reorganization and/or distribution to other unsecured creditors.

*In re Federal-Mogul*, 331 B.R. at 169.

While we typically defer to a bankruptcy court's discretionary decisions, *see Evans v. Buchanan*, 555 F.2d 373, 378 (3d Cir. 1977) (*en banc*) (noting that we reverse exercises of discretion "only when the judicial action is arbitrary, fanciful, or unreasonable, or when improper standards, criteria, or procedures are used"), we cannot

endorse its reasoning here because it failed to discuss a number of factors that, we believe, cause the equities to weigh heavily against the Debtors.

When it enacted § 365(d)(5), Congress sought to end the practice of debtors gaining leverage by forcing lessors to move to compel payment each time they wanted a lease obligation honored. *See* H.R. Rep. 103-835, at 50, *reprinted in* 1994 U.S.C.C.A.N. 3340, 3390. Here, the Debtors tried to do just that by failing to meet their obligations on time and then asking for modification as a defense to CSI's attempt to enforce the terms of the lease. Thus, the procedural posture of the Debtors' request cuts against them.

Related to this point is that because the Debtors did not properly seek modification until all of the leases had been rejected, they sought retroactive rather than prospective modification. We note that CSI has urged us to follow the Fourth Circuit Court of Appeals and hold that retroactive modification is prohibited by § 365(d)(5). *See CIT Communications Fin. Corp. v. Midway Airlines Corp. (In re Midway Airlines)*, 406 F.3d 229, 240 (4th Cir. 2005) (holding that § 365(d)(5) "does not allow a court to make an equitable adjustment of the amount recoverable as an administrative expense when the trustee fails to perform as required."). *But see In re Elder-Beerman Stores Corp.*, 201 B.R. 759, 764 (Bankr. S.D. Ohio 1996) ) (holding that bankruptcy courts should be "reluctant" to accord retroactive relief, but not foreclosing that possibility in "extraordinary circumstances"). We decline here to make a bright line rule, but we do note that § 365(d)(5) is structured so that vigilant debtors should not need a retroactive

11

remedy. The Debtors could have requested proration at the outset but did not; as noted, proration was never raised explicitly in the 2002 Order or the motion seeking it.

Next, the Debtors controlled the date of rejection. They could have rejected the leases at or near the end of the month, and thus paid only for the time they possessed the equipment. They did not avail themselves of this easier path, and we have no reason to absolve them in these circumstances.

Finally, there is nothing in this case inequitable about holding the Debtors to their bargain. *Cf. Stanziale v. FINOVA Capital Corp. (In re Tower Air, Inc.)*, 397 F.3d 191, 205 (3d Cir. 2005) (holding that there was nothing inequitable about giving an undersecured creditor the benefit of its security interest despite the fact that the debtor's repairs had—many years prior to the bankruptcy—increased the value of the collateral). Here, the Master Lease Agreement called for payment in advance on the first day of the month. Rejection permitted the Debtors to cut short the lease, but the monthly contract amount remained due. Equitable remedies are traditionally reserved for situations in which the operation of law would render an unfair, unjust, or otherwise extreme result. *See Louis W. Epstein Family P'ship v. K-Mart Corp.*, 13 F.3d 762, 770 (3d Cir. 1994). Simply noting in passing that modification will be convenient or provide minimally more money for reorganization is not enough to rewrite the terms to which the parties agreed. Yet the Debtors went no further, thus sealing our belief that they failed their burden of

12

showing exceptional unfairness or burden to the estate.[6]

*   *   *   *   *

We hold that CSI did not waive its argument against proration of its equipment leases because it is the Debtors' burden to request—unambiguously—modifications of personal property leases under § 365(d)(5). In addition, the equities in this case do not support modification because of the Debtors' dilatory conduct and their failure to provide a compelling justification for their request.

Therefore, we reverse the decision of the District Court and remand with instructions to remand to the Bankruptcy Court for entry of judgment in favor of CSI.

---

[6] CSI urges us to go further and hold that bankruptcy courts may never consider the extent to which the leased property benefits the bankruptcy estate as one of the "equities of the case." We counter with a judicial maxim: "never" need never be invoked when we can reach a result absent absolutes. CSI easily wins the equity battle on the facts of this case without the need to determine what role "benefit to the estate" may or may not play in future "equities of the case" inquiries. We need go no further.