In re RHODES, INC., Debtor.

Gwinnett Prado, L.P., GS II Brook Highland LLC, DDR MDT Independence Commons LLC, Sun Center Limited, Secured Properties Investors, XI, L.P., Centro Watt Operating Partnership 2, LLC and ESA, LP, Movants,

v.

Rhodes, Inc., Respondent.

No. 04–78434.

United States Bankruptcy Court, N.D. Georgia, Atlanta Division.

Feb. 11, 2005.

Matthew W. Levin, Mark I. Duedall, Jennifer M. Meyerowitz, Alston & Bird, LLP, Atlanta, GA, for Gwinnett Prado, L.P.

Darryl S. Laddin, Heath J. Vicente, Arnall Golden Gregory LLP, Atlanta, GA, for GS II Brook Highland LLC, DDR MDT Independence Commons LLC and Sun Center Limited.

James H. Rollins, Holland & Knight, Atlanta, GA, Alan M. Weiss, Holland & Knight, Jacksonville, FL, for Secured Properties Investors, XI, L.P. and Centro Watt Operating Partnership 2, LLC.

## ORDER

JAMES E. MASSEY, Bankruptcy Judge.

A recurring issue in bankruptcy cases is the extent to which a trustee or debtor in possession must pay rent and other charges arising under an unexpired lease of nonresidential real property prior to its rejection. The specific issue in these contested matters is whether Rhodes, Inc., which filed bankruptcy on November 4, 2004, owes postpetition rent at the contract rate for the period November 4 through November 30 under leases providing that monthly rent was due on November 1. The resolution of this issue depends on the meaning of section 365(d)(3) of the Bankruptcy Code, 11 U.S.C. § 365(d)(3). Deciphering that meaning requires an understanding of how the Bankruptcy Code treats unexpired leases of nonresidential real property.

What to do about unexpired leases of commercial real estate is often a sticky problem in bankruptcy cases because some leases are assets, while others are liabilities. Section 365(a) of the Bankruptcy Code permits the trustee (or debtor in possession in a Chapter 11 case) to "assume," and thereby keep or assign a lease having ongoing value, provided certain conditions are met, and to "reject" a lease having no significant value to the estate. Evaluation of leases to figure out whether to assume or reject them often takes considerable time. Even if a lease is known to be a liability and will be rejected, the trustee may still need to use the space temporarily until a sale of assets located there can be held or until alternative premises can be found.

Rejection of a lease not previously assumed is not a termination of the lease for state law purposes but rather is treated as a breach deemed to have occurred immediately prior to the petition date. 11 U.S.C. § 365(g)(1). Thus, damages resulting from rejection are deemed to constitute a pre-petition claim. If a lease is rejected, the landlord regains possession of the premises. *See* 11 U.S.C. § 365(d)(4).

A landlord's claim for damages that arose or were deemed to have arisen prior to the petition date is limited in part by section 502(b)(6) of the Bankruptcy Code, 11 U.S.C. § 502(b)(6). That section provides for disallowance of claims for "damages resulting from the termination" of the lease, to the extent that such claims exceed:

(A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of—

(I) the date of the filing of the petition; and

(ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus

(B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates[.]

11 U.S.C. § 502(b)(6). For purposes of section 502(b)(6), "rejection of a lease under section 365 is equivalent to a termination by breach." 4 COLLIER ON BANKRUPTCY ¶ 502.03[7][b] (15th Edition Revised, 2003).

Prior to October 1, 1984, section 503(b)(1)(A) of the Bankruptcy Code governed the allowance and computation of an administrative expense for use of nonresidential real property leased to a debtor during the period between the date of the order for relief and the date on which a lease was rejected or deemed rejected (hereafter the "Pre–Rejection Period"). Section 503(b)(1)(A) provides in relevant part:

(b) After notice and a hearing, there shall be allowed administrative expenses . . . , including—

(1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case[.]

11 U.S.C. § 503(b)(1)(A). In order to be paid for the use of leased premises, a landlord had to file an application for payment. Notwithstanding that a landlord might have been incurring costs every day of the lease, payment was often postponed in Chapter 11 cases until confirmation of the plan. The amount of the expense was measured by the reasonable value of the use and occupancy of the property, which might or might not be the amount of rent specified in the lease. *See, e.g., In re Rhymes, Inc.,* 14 B.R. 807, 808 (Bankr. D.Conn.1981). If the trustee did not actually use the property, no administrative

expense was incurred. This treatment of lessors of real property differed from that of other entities providing services to the estate after the petition date and prompted Congress to change the law by adding section 365(d)(3) to the Bankruptcy Code as of October 1, 1984.

Section 365(d)(3) provides in relevant part as follows:

(3) The trustee shall timely perform all the obligations of the debtor . . . arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title . . . .

The reference to "trustee" includes a debtor in possession in a Chapter 11 case. 11 U.S.C. § 1107. The filing of a voluntary bankruptcy petition constitutes an "order for relief" under the chapter designated on the petition. 11 U.S.C. § 301. In an involuntary case, on the other hand, the court actually enters an order for relief if the petitioning creditors can prove the requisite facts or if the debtor consents to be in bankruptcy, 11 U.S.C. § 303, and the entry of such an order for relief almost always occurs after the petition date.

With this background, the Court now turns to the contentions of the parties to these contested matters, followed by an analysis of section 365(d)(3) and cases applying it.

Gwinnett Prado, L.P., GS II Brook Highland LLC, DDR MDT Independence Commons LLC, Sun Center Limited, Secured Properties Investors, XI, L.P., Centro Watt Operating Partnership 2, LLC and ESA, LP (collectively the "Landlords") lease parcels of commercial real estate to Rhodes. Under each of those leases, rent is payable in advance on the first day of the month. Debtor has not paid any portion of the November rents

under these leases. The Landlords move for orders requiring Debtor to pay, as postpetition expenses, rent for the period November 4 through November 30, 2004. The Landlords other than ESA, LP contend that section 365(d)(3) requires a trustee or debtor in possession to pay rent at the rate stated in the lease from the petition date, regardless of when the obligation to pay rent first comes due. Alternatively, all of the Landlords contend that the "stub" rent from November 4 through November 30 is an administrative expense under section 503(b)(1) of the Bankruptcy Code, 11 U.S.C. § 503(b)(1), and should be allowed and paid immediately in the same manner as other administrative expenses.

Rhodes opposes the Landlords' motions, contending that the obligations to pay November rents arose only on the due date of November 1, which was outside the Pre–Rejection Period, and therefore that section 365(d)(3) does not require it to pay stub rents for November. It also argues that section 365(d)(3) alone governs the obligation of a trustee or debtor in possession to pay administrative expenses related to unexpired leases; therefore, it reasons, the Landlords have no right to payment of any November rent as an administrative expense because their claims for that month's rents arose prepetition. Alternatively, Debtor argues that the Court should defer proceedings on any issues under section 503(b)(1)(A) because those issues will be mooted with respect to any lease that Debtor assumes.

■ Debtor asserts that the meaning of section 365(d)(3) is plain. The Landlords contend that its meaning is ambiguous. Their disagreement is not unique. Notwithstanding the passage of twenty years since the enactment of section 365(d)(3), courts continue to disagree about its meaning. *Compare, e.g., In re Handy Andy Home Improvement Ctrs., Inc.,* 144 F.3d 1125, 1127 (7th Cir.1998) (Posner, C.J.) (holding that prepetition taxes do not arise during the Pre–Rejection Period simply because the billing date occurs during that period); *In re Ames Dep't Stores, Inc.,* 306 B.R. 43, 67–70 (Bankr.S.D.N.Y.2004) (holding that section 365(d)(3) is ambiguous and adopting a proration approach to determine the amount of obligations, rather than a billing date approach); *Newman v. McCrory Corp. (In re McCrory Corp.),* 210 B.R. 934, 939–40 (S.D.N.Y.1997) (same) *with CenterPoint Props. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.),* 268 F.3d 205, 209–10 (3d Cir.2001) (holding that section 365(d)(3) is not ambiguous and requiring debtor to pay prepetition taxes that came due during the Pre–Rejection Period); *Koenig Sporting Goods, Inc. v. Morse Road Co. (In re Koenig Sporting Goods, Inc.),* 203 F.3d 986, 989 (6th Cir.2000) (holding that the debtor was liable for all of the rent for the month during which the lease was rejected because the due date for paying that month's rent preceded the rejection date); *HA–LO Indus., Inc. v. CenterPoint Props. Trust,* 342 F.3d 794, 798–800 (7th Cir.2003) (same).

■ To resolve a dispute over the meaning of a statute, a court first looks to the language of the statute itself. *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). Where the statute's language is plain, "the sole function of the courts is to enforce it according to its terms." *Id.* (citing *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917)).

■ In deciding whether a section of a statute has a plain meaning, however, a court " 'must not be guided by a single sentence or member of a sentence, but [must] look to the provisions of the whole law, and to its object and policy.' " *Off-*

*shore Logistics, Inc. v. Tallentire,* 477 U.S. 207, 221, 106 S.Ct. 2485, 91 L.Ed.2d 174 (1986) (quoting *Mastro Plastics Corp. v. NLRB,* 350 U.S. 270, 285, 76 S.Ct. 349, 100 L.Ed. 309 (1956), which quotes *United States v. Heirs of Boisdore,* 8 How. 113, 122, 12 L.Ed. 1009 (1850)).

■ "[W]hen Congress' words admit of more than one reasonable interpretation, 'plain meaning' becomes an impossible dream, and an inquiring court must look to the policies, principles and purposes underlying the statute in order to construe it. Congress, after all, does not legislate in a vacuum." *Thinking Machs. Corp. v. Mellon Fin. Servs. Corp. # 1 (In re Thinking Machs. Corp.),* 67 F.3d 1021, 1025 (1st Cir.1995) (citations omitted).

Courts holding that the statute is not ambiguous say it means that an obligation to make payments for rent or taxes arises each time a payment is due under the lease. The best example of a decision holding that the meaning of section 365(d)(3) is unambiguous is the Third Circuit's decision in *Montgomery Ward.* In that case, a split panel of the Third Circuit held that the debtor was obligated to pay over $1,000,000 in real estate taxes assessed for a time period prior to the petition date because the lease required payment of such taxes when the landlord submitted the bill and the landlord submitted the bill to the debtor during the Pre–Rejection Period. *In re Montgomery Ward Holding Corp.,* 268 F.3d at 209–10.

Yet, the majority acknowledged having qualms about its decision: "We reach the conclusion that § 365(d)(3) is unambiguous with some reluctance given that one sister court of appeals and a number of other courts have reached the opposite conclusion and have opted for a proration approach." *Id.* at 211 (citations omitted). The case decided by the sister court to which the Third Circuit referred was *In re*

*Handy Andy Home Improvement Ctrs., Inc.,* 144 F.3d 1125 (7th Cir.1998), discussed below.

In *Koenig Sporting Goods v. Morse Road Co. (In re Koenig Sporting Goods),* 203 F.3d 986 (6th Cir.2000), the issue was whether the debtor had to pay rent for the entire month in which it rejected the lease after the date on which the rent came due. The Sixth Circuit concluded that "[i]n this case, involving a month-to-month, payment-in-advance lease, where the debtor had complete control over the obligation, we believe that equity as well as the statute favors full payment to Morse." *Id.* at 989.

The Seventh Circuit in *HA–LO Indus., Inc. v. CenterPoint Props. Trust,* 342 F.3d 794, (7th Cir.2003), distinguishing its earlier decision in *In re Handy Andy Home Improvement Ctrs., Inc., supra,* reached the same result as the Sixth Circuit did in *Koenig* on the same fact pattern. "We agree with the Sixth Circuit that equity as well as the statute favors full payment." *Id.* at 800. But if the statute's meaning is plain, why refer to "equity?"

Many courts have held that section 365(d)(3) is ambiguous. *See, e.g., Child World, Inc. v. The Cambell/Mass. Trust (In re Child World, Inc.),* 161 B.R. 571, 574 (S.D.N.Y.1993); *Schneider & Reiff v. William Schneider, Inc. (In re William Schneider, Inc.),* 175 B.R. 769, 772 (S.D.Fla.1994); *In re McCrory Corp.,* 210 B.R. at 939; *National Terminals Corp. v. Handy Andy Home Improvement Ctrs., Inc.,* 222 B.R. 149, 155 (N.D.Ill.1997), *aff'd In re Handy Andy Home Imp. Ctrs., Inc., supra; Santa Ana Best Plaza, Ltd. v. Best Prods. Co. (In re Best Products Co.),* 206 B.R. 404, 407 (Bankr.E.D.Va.1997); *In re Learningsmith, Inc.,* 253 B.R. 131, 133–34, (Bankr.D.Mass.2000); *In re NETtel Corp.,* 289 B.R. 486, 491–92 (Bankr.D.D.C.2002);

*In re Ames Dep't Stores, Inc.,* 306 B.R. 43, 66–67 (Bankr.S.D.N.Y.2004).

Courts that have found section 365(d)(3) to be ambiguous say that it could also mean that an obligation arising during the Pre–Rejection Period is one that accrues during that period. In his dissent in the *Montgomery Ward* case, Judge Mansmann articulated this counterpoint:

> While I agree that the terms of the lease determine the obligation, the statute says nothing about how to determine when the obligation arises. Nothing in the text is inconsistent with the common-sense view that when an obligation arises may be fixed by its intrinsic nature and/or by the extrinsic circumstances of its accrual. An obligation attributable to a particular time may well be said to "arise" at that time, and an obligation that accrues over time may be said to "arise" as it accrues, without doing violence to the statutory language.

*In re Montgomery Ward Holding Corp.,* 268 F.3d at 213.

The use of the word "timely" in section 365(d)(3) does not undermine Judge Mansmann's analysis. "Timely" means "opportunely as regards time." OXFORD ENGLISH DICTIONARY (2nd Ed.1989). A similar definition is "in time: OPPORTUNELY." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed.1995). "Opportune" is an adjective, with respect to which opportunely is the adverbial form, meaning "suitable or convenient for the particular occurrence" and "occurring at an appropriate time." *Id.* Thus, the word "timely" is not defined in the sense of "on time" or "when due" and can mean at an appropriate time. Payment during a grace period would be timely, even if the payment is made post-petition. Even payment at the end of the first month would be timely in the sense of suitable under the circumstances of the filing of a bankruptcy case. A rent payment need not be paid on the due date to be "timely."

Courts have also found ambiguity in the undefined term "obligations," which has to mean something less than a "claim" as that term is defined in 11 U.S.C. § 101(5). Some courts have found differing meanings depending on which word the phrases "from and after the order for relief" and "until such lease is assumed or rejected" modify. *See, e.g., In re Ames Dep't Stores, Inc.,* 306 B.R. at 67–68.

Issues of ambiguity also swirl around the word "arise" in the context of the section. The word "arise" means "to spring up ... into existence," OXFORD ENGLISH DICTIONARY (2nd Ed.1989) or "to come into being," MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed.1995). Hence, such an obligation must come into existence under the lease during the Pre–Rejection Period.

The best example of the view that an obligation can arise prior to a due date is the Seventh Circuit's decision in the *Handy Andy* case. There, taxes on the leased property were assessed for a period prior to the petition date, the same fact pattern as in the *Montgomery Ward* case. The lease there required the lessee/debtor to pay those taxes when billed by the landlord. The landlord billed the debtor during the Pre–Rejection Period. Rejecting the landlord's contention that the billing date dictated when the obligation to pay the taxes arose, the Court of Appeals stated that "[T]his 'billing date' approach is a possible reading of section 365(d)(3), but it is neither inevitable nor sensible." *In re Handy Andy Home Improvement Ctrs., Inc.,* 144 F.3d at 1127.

The obligation to pay the taxes arose prior to bankruptcy, the Court said, because the debtor would have been obligated to pay them had the lease been termi-

nated prior to the billing date. The Court reasoned that those taxes were "sunk costs" and not costs associated with keeping the business going during the Pre–Rejection Period. *Id.* at 1128.

But since death and taxes are inevitable and Handy Andy's obligation under the lease to pay the taxes was clear, that obligation could realistically be said to have arisen piecemeal every day of 1994 and to have become fixed irrevocably when, the last day of the year having come and gone, the lease was still in force. . . .

*Id.* at 1127.

The phrase "notwithstanding section 503(b)(1) of this title" gives rise to another persuasive argument for ambiguity. By carving away section 503(b)(1), Congress signaled replacement of the prior law governing how the amount of the *post-petition* expense under a nonresidential lease was to be computed, because section 503(b)(1) is concerned only with post-petition administrative expenses.

Note what section 365(d)(3) does not say. It does not say "and notwithstanding sections 365(g) and 502(b)(6)." Recall that under those sections, a damage claim arising from rejection of a lease is treated as a prepetition claim, subject to a cap. Under the old law, rejection of a lease such as the one in the *Montgomery Ward* case would have resulted in the classification of the unsatisfied liability to reimburse the landlord for a prepetition tax as a prepetition claim, even if the payment date was during the Pre–Rejection Period. Congressional intent to change how a landlord's postpetition expense claim would be treated is clearly evidenced by the exclusion of section 503(b)(1); nothing in the balance of section 365(d)(3) plainly evidences Congressional intent to give a landlord preferential treatment for what would otherwise

be a prepetition claim arising from rejection of the lease.

■ The Third Circuit acknowledged in no uncertain terms that its decision was at odds with that of the Seventh Circuit in the *Handy Andy* case. The Seventh Circuit tried to distinguish its earlier decision in *Handy Andy* but left that decision in tact as to prepetition taxes. *HA–LO Indus., Inc. v. CenterPoint Props. Trust,* 342 F.3d at 798–99. Thus, there remains a split in the circuits. "The existence of a split in the circuits in the interpretation of § 365(d)(3) is, in itself, evidence of the ambiguity in the language. *In re Southern Star Foods, Inc.,* 144 F.3d 712, 715 (10th Cir.1998)." *El Paso Props. Corp. v. Gonzales (In re Furr's Supermarkets, Inc.),* 283 B.R. 60, 66 n. 8 (10th Cir. BAP 2002). Not only have the circuits split, but there is a lively disagreement among district and bankruptcy courts concerning the meaning of section 365(d)(3).

Such dissension among federal judges should make one reluctant to conclude that the statute's meaning is as "plain" as both sides insist that it is. While the statute's meaning may appear obvious to an individual reader, a court cannot responsibly declare language to be "clear" when, as a matter of empirical reality, significant numbers of jurists have reasonable, good-faith disputes over its meaning. A judicial fiat declaring a statute to be unambiguous does not make it so.

*Allapattah Servs., Inc. v. Exxon Corp.,* 362 F.3d 739, 747 (11th Cir.2004) (Tjoflat, J. dissenting).

Based on this analysis, this Court concludes that section 365(d)(3) is ambiguous.

Many courts that have found the section to be ambiguous have relied heavily on the rather sparse legislative history behind the subsection to glean Congressional intent. The only legislative history is a statement

made by Senator Hatch that includes these remarks:

A second and related problem is that during the time the debtor has vacated space but has not yet decided whether to assume or reject the lease, the trustee has stopped making payments due under the lease.... In this situation, the landlord is forced to provide current services—the use of its property, utilities, security, and other services—without current payment. No other creditor is put in this position....

The bill would lessen these problems by requiring the trustee to perform all the obligations of the debtor under a lease of nonresidential real property at the time required in the lease. This timely performance requirement will insure that debtor-tenants pay their rent, common area, and other charges on time pending the trustee's assumption or rejection of the lease. For cause, the court can extend the time for performance of obligations due during the first 60 days after the order for relief, but not beyond the end of such 60–day period. At the end of this period, the amounts due during the first 60 days would be required to be paid, and thereafter, all obligations must be performed on time.

130 Cong. Rec. S8891, *reprinted in* 1984 U.S.C.C.A.N. 576, 599 (statement of Sen. Hatch).

From these remarks, one could conclude that the object was to require the trustee to make "current" payments of rent and other charges, implying an accrual method of determining the amount of obligations to be paid. The legislative history is inconclusive, however, because it also indicates that "all obligations must be paid on time," which could be construed as meaning on the due date.

The dispute over the meaning of this statute comes down to this: did Congress intend that section 365(d)(3) be read to mean that an obligation to pay rent, taxes or some other expense under a lease comes into existence on a due date or payment date, regardless of when the lease says that the tenant incurred an unavoidable liability to pay? Or, did Congress intend that the word "arise" be given the broadest possible meaning such that an obligation to pay rent, taxes or some other expense is deemed to accrue day by day, without regard to the text of the lease? Or, did Congress intend that an obligation to pay rent, taxes or some other expense arises when, under the terms of the lease and applicable law governing the lease, the debtor's liability to pay it becomes fixed in amount and unavoidable?

■ This Court holds that for purposes of section 365(d)(3), an obligation to pay rent, taxes or some other expense under an unexpired lease arises at the time that the tenant's liability on that obligation becomes fixed in an amount unalterable by subsequent events, such as the termination of the lease. This interpretation gives proper weight to the bargain the parties made and is by far the most sensible, given the wording of the statute.

Relevant policies and principles underlying the Bankruptcy Code are better served by this interpretation. First, it avoids a purely mechanical approach to figuring out when an obligation arises that might violate the policy of equal treatment of prepetition unsecured claims and the policy of economy in the administration of bankruptcy estates. With respect to the former policy, it prevents a landlord from receiving payment under section 365(d)(3) on a prepetition claim or for a post-rejection expense having no relationship to the Pre–Rejection Period other than a payment or billing date. As to the latter policy, it eliminates a need to use borrowed or other capital to pay debts for

which no new value is being provided to the enterprise in respect of such debts. As Judge Posner put it, "it tracks the purpose of giving postpetition creditors a high priority in the distribution of the debtor's estate. The purpose is to enable the debtor to keep going for as long as its current revenues cover its current costs, so that it does not collapse prematurely because of the weight of its existing debt." *In re Handy Andy Home Improvement Ctr., Inc.*, 144 F.3d at 1127.

■ Second, unlike most other entities dealing with a bankruptcy estate, the landlord under an unexpired lease is an involuntary participant in the postpetition life of the debtor. If the contract rate is too high, the trustee can jettison the contract by rejecting it, but the landlord has no choice but to provide the premises and the services required by the unexpired lease until it is rejected. Hence, it is fitting to interpret this section in a manner that is fair to both sides under these circumstances. The Bankruptcy Code is replete with provisions balancing competing interests. Under the Court's interpretation, the landlord is fully compensated for those liabilities that become unalterably fixed during the Pre–Rejection Period, even if the first due date for payment occurs after the Pre–Rejection Period. Thus, this solution provides an even-handed approach based on the bargain of the parties. If the trustee does not want to incur the expense, he has an out: reject the lease.

■ The specific question posed in these contested matters can be resolved by determining whether the tenant would have been obligated to pay an entire month's rent if the lease had been terminated on the second day of the month. If not, the obligation to pay rent presumably accrues until termination or expiration and is not fixed on a due date, though there could be consequences for not paying on a "timely" basis. Another way of approaching the problem is to ask whether a tenant would be entitled to a refund of a full month's rent paid on the first, if the tenant's obligations were otherwise current and the lease were terminated on the second because the premises were destroyed due to no fault of the tenant. If the tenant would have a right to a refund, the obligation to pay rent would arise each day that the lease is in effect. These examples may not be the only way to decipher the intent of the parties.

The parties have for the most part treated these contested matters as turning on whether section 365(d)(3) alone supplies the answer to whether an obligation to pay rent arises on a due date or accrues from day to day. They have not directly addressed the question of what each lease provides about the creation of an obligation to pay rent. Accordingly, as the next step in resolving these disputes, the Court will require each Movant to show what the parties to each lease intended with respect to when a liability to pay rent became fixed and unalterable. That showing may be made by parsing the language of the lease or through other evidence, including affidavits. Once a Movant has filed a supplemental brief, together with any evidence it desires to point to, Debtor may file a response articulating its reading of the lease and may also present evidence. If there is an issue of material fact concerning what the lease provides, the matter will have to be tried.

■ The alternative issue raised by the these motions is whether and to what extent a landlord is entitled to payment of an administrative expense with respect to stub rent under section 503(b)(1). Rhodes argues that the claims of the Landlords here arose prepetition because the rent for November came due under their respective leases on November 1. It further as-

serts that the fact that it received postpetition benefits by using the premises did give not rise to an administrative expense, relying primarily on *In re Jartran, Inc.*, 732 F.2d 584, 587 (7th Cir.1984) for this principle. Debtor is mistaken.

In *Jartran,* the debtor had contracted prepetition with an advertising agency and another company to place ads in Yellow Page directories. Payment for those ads was not due until after each was published. Prior to publication, the debtor filed its bankruptcy petition. Later, the ads were published, and the advertising agency and the other company filed a motion in the bankruptcy court to require the debtor to pay the amount due under the contract as an administrative expense. The lower courts and the Seventh Circuit held that the movants were not entitled to payment under the contract as an administrative expense, notwithstanding the fact that the debtor got the benefit of the ads. The reason that section 503(b)(1)(A) did not apply was because "the liability for the costs of the ads was *irrevocably incurred* before the petition was filed." *In re Jartran, Inc.*, 732 F.2d at 588 (emphasis added). "[T]he key fact is that the irrevocable commitment by Jartran, Donnelley and Tinsley to place the ads was made before the filing of the petition in bankruptcy." *Id.* at 586. Rhodes' counsel failed to state this key fact in its omnibus objection to the motions.

The contract in *Jartran* was executory because it covered the placements of ads that could have been withdrawn postpetition, *see id.* at 586 n. 2. With respect to the billings at issue, however, the contract was in effect no longer executory. The movants had fully performed their obligations, and the debtor's obligation to pay, contingent only on the directories being published, would not have made that portion of the contract executory. Here, by contrast,

each contract is an unexpired lease, a type of executory contract.

■ As a general proposition, the nondebtor party to an unexpired lease or other executory contract is obliged to perform it until it is assumed or rejected. *Pub. Serv. Co. of N.H. v. N.H. Elec. Coop., Inc. (In re Pub. Serv. Co. of N.H.),* 884 F.2d 11, 14 (1st Cir.1989) (stating that while the debtor decides whether to reject or assume "the executory contract remains in effect and creditors are bound to honor it."); *Skeen v. Denver Coca–Cola Bottling Co. (In re Feyline Presents, Inc.),* 81 B.R. 623, 626 (Bankr.D.Colo.1988) ("an executory contract under Chapter 11 is not enforceable against the debtor party, but is enforceable against the nondebtor party prior to the debtor's assumption or rejection of the contract.").

■ But the flow of consideration is not a one-way street.

If a debtor in possession actually uses leased property prior to rejection, the lessor may recover the unpaid rent, or the reasonable value of the debtor in possession's use and occupancy, as an administrative expense. *In re Thompson,* 788 F.2d 560, 562 (9th Cir.1986); *In re Aerospace Technologies, Inc.,* 199 B.R. 331, 339–40 (Bankr.M.D.N.C.1996) (cost of storing property of the estate is an administrative expense). If the debtor in possession uses only part of the leased property, he must pay an administrative expense only for the part he uses. *In re Thompson, 788 F.2d at 562; Broadcast Corp. v. Broadfoot,* 54 B.R. 606, 611–13 (N.D.Ga.1985) (estate liable only for the seventeen days it actually used creditor's broadcast signal during the sixty day pre-rejection period), *aff'd,* 789 F.2d 1530 (11th Cir.1986); *cf. In re United Cigar Stores Co.,* 69 F.2d 513, 515 (2d Cir.) (trustee liable only for the use and occupation of the portion of the

leased premises that the estate physically occupied) (decided under the former bankruptcy act), *cert. denied,* 293 U.S. 566, 55 S.Ct. 76, 79 L.Ed. 665 (1934). *In re Patient Educ. Media, Inc.,* 221 B.R. 97, 102 (Bankr.S.D.N.Y.1998).

Unlike the claimants in *Jartran,* who had fully performed their obligation prior to the petition date, the Landlords here performed postpetition by providing the leased premises to Rhodes. Unlike the debtor in Jartran, which had no choice about whether or not the ads would be published, Rhodes chose to use the premises.

■ Section 365(d)(3) applies only to those obligations under the lease that arise during the Pre-Rejection Period. If an obligation arises under the lease outside the Pre-Rejection Period, it will not receive the treatment that section 365(d)(3) commands, but that is all that section 365(d)(3) says about such an obligation. It does not say that an obligation not within its parameters is not covered by section 503(b)(1). That much about section 365(d)(3) is as plain as plain can be. It would be a strange result indeed, bordering on the absurd, to hold that in enacting section 365(d)(3) to protect landlords, Congress intended to strip landlords of any right to payment of an administrative expense for use of their premises for the stub rent period and to leave them with only prepetition, unsecured claims.

It follows from this analysis that even if Debtor was unalterably liable to pay rent for the entire month of November on November 1, so that the Landlord had no right to payment under section 365(d)(3), that Landlord would still be entitled to payment of an administrative expense for the use of the premises between November 4 and November 30. Whatever expense Debtor incurred for the stub period would reduce the amount of the prepetition claim in those circumstances.

Debtor argues that the determination of the amount of the administrative expense incurred under each lease should be postponed until it decides whether to assume or reject each lease. Debtor's point is to conserve estate resources and the Court's time because in those instances in which it assumes the lease, the problem evaporates. This argument assumes, however, that the amount of the expense will be difficult or time consuming to establish. Nothing in the record shows that to be so. Even if Rhodes contends that the amount of an expense is some fraction of what the prorated rent would have been for the stub period, that fraction must be paid. As to timing of payment, there is no rational basis to distinguish an expense for rent conceded to be due from an expense for professional services or any other expense necessary to keep the business operating.

Based on the pleadings and arguments on these motions, there appears to be no dispute that Rhodes used all of each of the premises and operated its business during November 2004. If there is a dispute about the extent of occupancy, such a dispute would have to originate with Rhodes because it knows first hand what it used and did not use. Nor does there appear to be any dispute about what each lease provides. Some, but not all, of the Landlords attached copies of leases to their motions. To the extent that there is any doubt about what document or documents constitute a lease, the parties should address that matter as part of the further briefing that this Order requires. It is neither necessary nor desirable for a Landlord to file a second copy of the lease.

■ The presumption is that the contract rate defines the value of leased space to the trustee. *See Diversified Servs., Inc. v. Harralson,* 369 F.2d 93, 95 (5th Cir.

1966) (per curiam). Decisions of the Fifth Circuit prior to October 1, 1981 bind this Court. *Bonner v. City of Prichard, Ala.,* 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

> The law concerning which costs are actual and necessary to the preservation of the estate is well settled. As one commentator states:
>
>> "In short, the quantum of allowance as an expense of administration for use and occupation by the trustee will be measured by 'the reasonable value of such use and enjoyment.' Ordinarily this will be the contractual rent predicated and prorated from the time the trustee is in occupancy; but the contractual rent may not be clearly unreasonable." 3 Collier on Bankruptcy ¶ 503.04, pp. 503–15, 16 (15th ed.1980). (footnotes omitted) (emphasis in original). See also *Diversified Services Inc. v. Harralson,* 369 F.2d 93 (5th Cir.1966).

*In re Dunwoody Vill. Sporting Goods, Inc.,* 11 B.R. 493, 494 (Bankr.N.D.Ga.1981) (Drake, J.). Reference to cases under the Bankruptcy Act is entirely appropriate. The Supreme Court has noted on numerous occasions that courts should not "presume a departure from longstanding pre-Code practice." *See Dewsnup v. Timm,* 502 U.S. 410, 433, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992) (Scalia, J., dissenting); *see, e.g., Midlantic Nat'l Bank v. N.J. Dep't. of Envtl. Prot.,* 474 U.S. 494, 501, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986). The legislative history makes clear that Congress derived section 503(b) "mainly from section 64a(1) of the Bankruptcy Act ..." H.R.Rep. No. 95–595, 355 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6311. *See also* S.Rep. No. 95–989 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5852.

■ Hence, assuming that there is no dispute about what document (or set of documents) constitutes each lease and that those Landlords who have not filed a copy of their leases do so promptly, the Landlords have met their burden of going forward to show the amounts that they claim should be allowed as administrative expenses. The next step is for Rhodes to show what it asserts the amount of administrative expense to be with respect to each lease, without regard to its argument that section 365(d)(3) relieves it of any obligation to pay an administrative expense. Each such amount must be paid immediately. If the amount of the administrative rent that Rhodes concedes is due is less than the prorated rent under a lease for the stub period, it must also state the facts on which it bases its contention that the allowable expense under section 503(b)(1)(A) is less than the prorated rent provided for in that lease. If with respect to a lease, the amount of an administrative expense equals the amount of prorated rent under the lease for the balance of November, Debtor's resistance to paying that expense would be a charade adding no value to the estate that must end as soon as possible.

Once the briefs called for by this Order have been filed, the Court will hold pretrial conferences to determine the scope of discovery needed and the time needed to determine the actual value of the use of the premises to the estate. At trial, a Landlord is, of course, free to argue and try to prove that the value it provided to the estate is greater than what the rent was under the lease for the stub period.

For these reasons, it is

ORDERED that the Court defers its final ruling on the Landlords' motions to compel Debtor to pay rent for the period November 4 through November 30, 2004 as a postpetition expense. Each Landlord is directed to file on or before February 28, 2004, a supplemental brief and any

evidence in support thereof concerning the issue of when the obligation to pay rent for the period November 4 through November 30, 2004 arose under the respective leases as a matter of contract interpretation and within the meaning of section 365(d)(3) as set forth in this Order. Debtor shall have until March 15, 2005 to file and serve a response.

IT IS FURTHER ORDERED that Debtor shall file on or before February 28, 2005, a brief stating (1) the amount of administrative expense under 11 U.S.C. § 503(b)(1) that it contends it has incurred with respect to each lease, without regard to its argument that section 365(d)(3) relieves it of any obligation to pay an administrative expense, and (2) the factual basis on which Debtor reached its determination. Debtor is directed to pay to each Landlord on or before March 1, 2005, the amount of the administrative expense set forth in its response. Those payments shall be without prejudice to the rights of the parties concerning the ultimate amounts due. Each Landlord shall file on or before March 15, 2005, a response to Debtor's brief on the issue of the amount of administrative expense due under 11 U.S.C. § 503(b)(1).